1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRIAN JOSEPH DRISCOLL,<br><br>                                            Plaintiff,<br><br>v.<br><br>METLIFE INSURANCE;<br>ANHEUSER-BUSCH INBEV INC.; and<br>DOES 1 to 100<br><br>                                            Defendants. | Case No.: 15-CV-1162 JLS (LL)<br><br>**ORDER: (1) GRANTING DEFENDANT'S MOTION FOR JUDGMENT, AND (2) DENYING PLAINTIFF'S MOTION FOR JUDGMENT**<br><br>(ECF Nos. 107, 118) |

Presently before the Court are Plaintiff Brian Driscoll's ("Pl.'s Mot.," ECF No. 118[1]) and Defendants Metropolitan Life Insurance Co. ("MetLife") and Anheuser-Busch Companies, LLC's ("A-BC") ("Defs.' Mot.," ECF No. 107) cross-motions for judgment. The Court concludes that this matter is capable of resolution on the papers and without oral argument pursuant to Civil Local Rule 7.1(d)(1). Having carefully considered the Parties' arguments, the Plan (ECF No. 61-4), the Administrative Record ("AR," ECF Nos. 61-5–42), and the law, the Court **GRANTS** Defendants' Motion and **DENIES** Plaintiff's Motion.

---

[1] Plaintiff also filed an earlier version of his Motion. *See generally* ECF No. 114. The Court has reviewed both for purposes of this Order and has found that they are largely redundant. Because the second version is clearer and more comprehensive, the Court cites largely to that version.

## FINDINGS OF FACT

### I.     The Plan and Relevant Terms

MetLife issued a group certificate of insurance to A-BC, funding an employee welfare benefit plan (the "Plan"), *see generally* PLAN,[2] governed by the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001 *et seq.* ("ERISA"). *See* PLAN 56. Pursuant to the Plan, A-BC was the plan administrator, *see* PLAN 54, while Defendant MetLife was the claims administrator, *see* PLAN 55–56.

Among other benefits, the Plan provides for long-term disability ("LTD") benefits for eligible participants who become disabled as defined by the Plan and remain disabled throughout the entirety of a 180-day Elimination Period and each month thereafter for which disability benefits are sought. *See* PLAN 35–37. The Plan defines "Disabled or Disability" as follows:

> **Disabled or Disability** means that, due to Sickness or as a direct result of accidental injury:
>
> •     You are receiving Appropriate Care and Treatment determined by Your Physician as necessary to treat the Sickness or injury;
>
> •     You are complying with the requirements of such treatment; and
>
> •     You are unable to earn:
>
>> •     during the Elimination Period and the next 24 months of Sickness or accidental injury, more than 80% of Your Predisability Earnings or adjusted Predisability Earnings at Your Regular Occupation from any employer in Your Local Economy; and
>>
>> •     after such period, more than 80% of Your Predisability Earnings or adjusted Predisability

---

[2] PLAN citations are to Exhibit 1 to the Declaration of Matthew Hallford in Support of Defendants' Opposition to Plaintiff's Motion to Re-Open Case ("Hallford Decl."), previously filed as ECF No. 61-4.

> Earnings from any employer in Your Local Economy at any gainful occupation for which You are reasonably qualified taking into account Your training, education and experience.

PLAN 23 (emphasis in original).  The Plan requires a claimant to submit proof, "at the claimant's expense," PLAN 26, that he or she is Disabled as defined in the Plan, PLAN 35. The Plan defines "Proof" as:

> Written evidence satisfactory to Us that a person has satisfied the conditions and requirements for any benefit described in this certificate.  When a claim is made for any benefit described in this certificate, Proof must establish:
>
> • the nature and extent of the loss or condition;
> • Our obligation to pay the claim; and
> • the claimant's right to receive payment.

PLAN 26.

The Plan sets forth terms for claim submission, determination, and appeal.  *See* PLAN 55–56.  Following submission of an initial claim, "notification [is to] be provided to [the claimant] within a reasonable period, not to exceed 45 days from the date [the claimant] submitted [his or her] claim; except for situations requiring an extension of time because of matters beyond the control of the Plan, in which case MetLife may have up to two (2) additional extensions of 30 days each to provide [the claimant] such notification." PLAN 55.  "If MetLife needs an extension, it [is to] notify [the claimant] prior to the expiration of the initial 45 day period (or prior to the expiration of the first 30 day extension period if a second 30 day extension period is needed), state the reason why the extension is needed, and state when it will make its determination." *Id.*

In the event of a denial, the claimant is entitled to appeal the decision.  *Id.*  "After MetLife receives [a claimant's] written request appealing the initial determination, MetLife [is to] conduct a full and fair review."  PLAN 56.  "Deference [is] not . . . given to the initial denial, and MetLife's review . . . look[s] at the claim anew."  *Id.*  "The review on appeal . . . takes into account all comments, documents, records, and other information that

[the claimant] submit[s] relating to [his or her] claim." *Id.* "If the initial denial is based in whole or in part on a medical judgment, MetLife . . . consult[s] with a health care professional with appropriate training and experience in the field of medicine involved in the medical judgment." *Id.* "MetLife [is to] notify [the claimant] in writing of its final decision within a reasonable period of time, but no later than 45 days after MetLife's receipt of [the claimant's] written request for review, except that under special circumstances MetLife may have up to an additional 45 days to provide written notification of the final decision." *Id.* "If such an extension is required, MetLife [is to] notify [the claimant] prior to the expiration of the initial 45 day period, state the reason(s) why such an extension is needed, and state when it will make its determination." *Id.* "If an extension is needed because [the claimant] did not provide sufficient information, the time period from MetLife's notice to [the claimant] of the need for an extension to when MetLife receives the requested information does not count toward the time MetLife is allowed to notify [the claimant] of its final decision." *Id.* "If MetLife denies the claim on appeal, MetLife [is to] send [the claimant] a final written decision that states the reason(s) why the claim [the claimant] appealed is being denied and reference[] any specific Plan provision(s) on which the denial is based." *Id.*

Under the terms of the Plan, "the Plan Administrator and other Plan fiduciaries (which shall include MetLife as the Claim Fiduciary) shall have discretionary authority to interpret the terms of the Plan and to determine eligibility for and entitlement to Plan benefits in accordance with the terms of the Plan." *Id.* Further, "[a]ny interpretation or determination made pursuant to such discretionary authority shall be given full force and effect, unless it can be shown that the interpretation or determination was arbitrary and capricious." *Id.*

Pursuant to ERISA, all participants in the Plan are entitled to "[o]btain, upon written request to the Plan Administrator, copies of documents governing the operation of the Plan, including insurance contracts and copies of the latest annual report (Form 5500 Series) and updated summary plan descriptions." PLAN 57.

## II.    Plaintiff's Employment

Plaintiff worked as a Warehouse Manager for A-BC from November 4, 1989, until August 9, 2014.  *See, e.g.*, AR 838.[3]  As a Warehouse Manager, Plaintiff often worked ten-hour days, with his major roles including "receiving/UPS/unloading/loading in bulk, building and loading customer orders six days a week, checking in and out up-to 60 truck drivers and 20-30 contract truck drivers, [and] reprocessing damaged product."  *See, e.g.*, AR 1820.  Plaintiff's position also included responsibilities of the facility manager, material handling, and safety manager.  *See id.*  Facilities management involved "building and office housekeeping, maintenance and contracted services," while material handling involved "batteries, forklifts and walkie-riders (electronic stand-up forklift-type equipment), and specialized railroad guided forklift."  *Id.*

According to Defendants, Plaintiff's position "involved frequent standing, walking, bending, squatting, [and] trunk rotation[;] occasional sitting, climbing, balancing, crawling, and driving[;] and . . . work at heights and . . . around moving mechanical parts."  AR 838; *see also* AR 3540–3541.  The demands of Plaintiff's position were classified as "very heavy."  AR 855; *see also* AR 3540.

## III.    Plaintiff's Claims for Benefits and MetLife's Denials

Plaintiff took a leave of absence from work between January 23 and February 9, 2014.  AR 1787.  He filed claim 711401298061 for LTD benefits with MetLife on January 30, 2014 (the "First Claim").  AR 3660.  Plaintiff's First Claim was denied when he returned to work on February 10, 2014.  AR 3668–3669.

Plaintiff took a second leave of absence from work beginning March 3, 2014, but he returned to work on May 20, 2014.  AR 1787.  He went on disability beginning August 9, 2014.  *Id.*  On August 12, 2014, Plaintiff renewed his First Claim with MetLife seeking LTD benefits as of August 10, 2014.  AR 3672–3673, 3686.  He submitted a formal claim

---

[3] AR citations are to the Administrative Record, previously filed with the Court as Exhibit 2 to the Hallford Declaration, ECF Nos. 61-5 through 61-42.

on August 26, 2014, AR 3247–3264, which was assigned claim number 741408156858 (the "Second Claim"), *see* AR 3686; *see also* AR 3673.  In the paperwork, he described his symptoms as "di[zziness], nausea, ringing in ear, ear pressure, fatigue, high [blood pressure], palp[i]tations, [irritable bowel syndrome], difficulty recalling names [and] facts, math difficult[y]."  AR 3252.  He identified his attending physicians as follows: Dr. Michael Rogers, primary care physician; Dr. Christopher Trent, otorhinolaryngologist; Dr. Prasanth Mathena, neurologist; and Dr. William Go, gastroenterologist.  *Id.*  He also listed a number of medications he was taking for his condition.  *Id.*

Following receipt of Plaintiff's medical records, a nurse consultant at MetLife performed a review on December 16, 2014.  AR 3722–3731.  On December 19, 2014, the nurse consultant called Plaintiff to discuss his claim and his condition.  AR 3731–3737.  Later that day, the nurse consultant discussed Plaintiff's file with MetLife's Medical Director.  AR 3741–3743.  She then placed a note in his file indicating that the available medical information did not support disability, but recommending a reevaluation following review by nontreating physicians:

> In my opinion, [t]he available medical information submitted is insufficient to support the claim that he would be unable to work while continuing evaluation and treatment of his reported symptoms during the period in question.  While the claimant has complaints dizziness, nausea and ear pressure[,] the . . . submitted studies (VNG, ENG, audiometry, brain MRI) and physical exam notes[] did not appear to document physically impairing conditions such as intractable vomiting, gait instability, orthostatic hypotension, hemodynamic instability, blurred vision[], headaches, or cranial nerve dysfunction which generally results in an impairing disorder.  I recommend reevaluation in 2-3 weeks when we may have res[]ults of a file review by a group of "nontreating" physicians.

AR 3743–3744.

Following multiple efforts to speak with Plaintiff's providers beginning December 22, 2014, *see* AR 3745–3746, 3756–3766, 3768–3769, MetLife connected with Dr. Rogers on January 14, 2015, *see* AR 3771.  Dr. Rogers explained that he was a new

provider to Plaintiff and had only been seeing him for approximately four or five months. *Id.* He reported that Plaintiff had been suffering from nausea/vomiting and dizziness of unknown etiology for over two years. AR 3772. Dr. Rogers felt that Plaintiff was being "honest" and "not playing games." *Id.* He opined that Plaintiff's symptoms rendered him disabled and unable to perform even sedentary work. AR 3772–3773.

On February 19, 2015, MetLife sent Plaintiff a letter rejecting the Second Claim. AR 3788; *see also* AR 3348–3351. Specifically, the letter informed Plaintiff that "[MetLife] ha[s] completed [its] review of [Plaintiff's] claim for LTD benefits and concluded that [Plaintiff's] claim for benefits has been denied as [he] d[id] not meet the definition of disability throughout the entire elimination period and beyond." AR 3348. The letter noted that "[t]he time frame in which [MetLife's] medical review focused on was from August 10, 2014 – the day [Plaintiff's] disability commenced, to February 6, 2015 the end of [his] Elimination Period," although "[a] majority of the medical information submitted via the disc dated back to early 2014." *Id.* The letter continued that, "[i]n August 2014[,] Dr. Michael Seth Rogers listed you as unable to work due to your reported symptoms of dizziness, nausea, and fatigue" and that "[t]he medical information included in [Plaintiff's] file would support medical treatment from an array of doctors in different specialties from August 2014 and beyond," although "[s]ubsequent exams would conclude no abnormal findings or formal diagnosis." AR 3349. The letter explained that the Nurse Consultant had "performed a thorough review of [Plaintiff's] medical information[,] arriving at the same conclusion that the medical information submitted failed to support an ongoing disability" and that the Nurse Consultant had "attempted to contact Kaiser Permanente for further clarification on [Plaintiff's] medical information with little success." *Id.* "[Plaintiff's] claim was [then] referred for another review with [MetLife's] Medical Director, Dr. David Peters[, whose] conclusion also aligned with previous outcomes." AR 3349–3350. In short, "[b]ased on his medical opinion the available medical information submitted was insufficient to support the claim that [Plaintiff] would be unable to work while continuing evaluation and treatment of reported

symptoms during the period in question." AR 3350. Consequently, "[w]hile the medical records submitted would support some restrictions and limitations to perform work capacity, this is not medically supported beyond February 6, 2015," and "[b]enefits for LTD have been denied because medical does not support disability throughout the elimination period to the LTD benefit start date and beyond." *Id.* The letter then provided Plaintiff with instructions as to how to appeal the denial. *Id.*

## IV. Plaintiff's First Appeal and MetLife's Review

On January 14, 2015, before receiving MetLife's letter dated February 19, 2015, Plaintiff sent MetLife the following e-mail:

> Hello, as per my policy, I wish an appeal of this adverse decision denying long term disability. Additionally, I am requesting all medical records, expert opinions/reports/evaluations used to make this decision, recorded conversations and any and all records used by MetLife or their affiliates to make this determination. Lastly, as I believe as according to my policy, request this reevaluation (appeal) of this decision within 30 days of this denial. After this 30 day appeal period, in accordance with HIPPA regulations, I revoke my permission to allow MetLife or their affiliates access to any and all my medical records both past and future records.

AR 3781–82. After sending out the denial letter, MetLife contacted Plaintiff to inform him that he would need to file a written appeal request. *See* AR 3789–3793.

Plaintiff sent an appeal letter on March 12, 2015, AR 3341, which MetLife received on March 17, 2015. *See* AR 3794. The letter referenced the First Claim, *see* AR 3341, and indicated it was "a follow-up to [Plaintiff's] request completed on-line on 01/13/2015 to [MetLife's] first notification to [him] that [it] w[as] denying [his] claim because '[he] was deemed ineligible.'" *Id.* After acknowledging receipt of the denial letter, Plaintiff "request[ed] a complete and <u>entire</u> copy of [his] claim file (including recorded conservations) not just what MetLife deemed as relevant so that [he] can properly evaluate and to give proper reasoning for [his] reevaluation/appeal request." *Id.* (emphasis in original). "In addition, I am asking <u>again</u> from both MetLife and Anheuser-Busch Inc HR

Services to provide [him] with the entire policy, including the financials, used to determine [his] claim." *Id.* (emphasis in original).

On August 25, 2015, MetLife sent a letter to Plaintiff acknowledging receipt of Plaintiff's January 14, 2015 appeal letter on January 22, 2015, *see* AR 3649, and receipt of a subsequent appeal letter, dated March 12, 2015, on March 17, 2015, *see* AR 3650. MetLife noted that it had sent a complete copy of Plaintiff's claim file to him by Federal Express on March 30, 2015, which Federal Express confirmed had been picked up on April 10, 2015. *Id.* MetLife added that, "[a]s of the date of this letter other than your previous letters from January and March 2015 we have not received the reason(s) you believed your claim was improperly denied." *Id.* MetLife added:

> the only additional information submitted to the MetLife claim office was from Best Doctors which was not dated; a denial notice dated February 26, 2015 from the Social Security Administration; a summons in a civil action dated May 26, 2015 from the United States District Court, Southern District of California; a Family Medical Leave of Absence (FMLA) form dated June 25, 2015 authorized by Dr. Michael Seth Rogers; and a work status report dated June 23, 2015 also signed and authorized by Dr. Michael Seth Rogers.

AR 3651. "Accordingly, since the 180th day from the denial letter dated February 19, 2015 has been exhausted we are beginning the appeal review based on the information already on file for the date of disability August 10, 2014 referenced by LTD claim number 741408156858." *Id.*

## V.   Denial of Disability Benefits from the Social Security Administration

Plaintiff also filed for disability benefits from the Social Security Administration ("SSA"), again claiming "di[zziness]; nausea; sleep apnea; pressure and ringing in ears; fatigue; high blood pressure; IBS; heart palp[i]tations; difficulty recalling names, facts, simple math." AR 3336. On February 26, 2015, the SSA concluded that Plaintiff "d[id] not qualify for benefits on this claim . . . because [he was] not disabled under [its] rules." ///

*Id.* The SSA noted that Plaintiff's "conditions are stable and do not significantly interfere with [his] day to day activities." *Id.* The SSA explained:

> Though you may have memory issues and a history of ADHD, your records show that you are able to think, communicate and act in your own interest. The evidence shows you are able to adjust to ordinary emotional stresses, and to get along with others, as well as to do your usual activities and to remember and follow basic instructions.

> You are able to occasionally lift 20 pounds and frequently lift 10 pounds; stand and walk up to 6 hours in a normal 8 hour workday, and sit for about 6 hours in a normal work day.

> Your condition results in some limitations in your ability to perform work related activities. However, these limitations do not prevent you from performing work you have done in the past as a Supervisor, as you described. We have determined that your condition is not severe enough to keep you from working. We considered the medical and other information and work experience in determining how your condition affects your ability to work.

AR 3337.

On May 26, 2015, the SSA "found that [its] first decision was correct." AR 2705. The SSA noted that, while "[t]he medical evidence shows [Plaintiff's] condition results in some limitations in [his] ability to perform work related activities . . . , these limitations do not prevent [him] from performing work [he] ha[s] done in the past as a/an Supervisor, as [he] described," and, consequently, the SSA "ha[s] determined that [Plaintiff's] condition is not severe enough to keep [him] from working." *Id.* Specifically, the SSA again found:

> Though you may have memory issues and a history of ADHD, your records show that you are able to think, communicate and act in your own interest. The evidence shows you are able to adjust to ordinary emotional stresses, and to get along with others, as well as to do your usual activities and to remember and follow basic instructions.

/ / /

> You are able to occasionally lift 20 pounds and frequently lift 10 pounds; stand and walk up to 6 hours in a normal 8 hour work day, and sit for about 6 hours in a normal work day.
>
> Your condition results in some limitations in your ability to perform work related activities.  However, these limitations do not prevent you from performing work you have done in the past as a Supervisor, as you described.  We have determined that your condition is not severe enough to keep you from working.  We considered the medical and other information and work experience in determining how your condition affects your ability to work.

AR 2706.

## VI.    Prior Litigation

In the interim, on May 26, 2015, Plaintiff filed his Complaint against MetLife and A-BC, alleging the following eleven[4] causes of action: (1) breach of contract against Defendant MetLife, (2) failure to provide plan/policy documents in violation of 29 U.S.C. § 1132(c)(1)(B) (Section 1132) against Defendant ABC, (3) interference of rights under ERISA in violation of 29 U.S.C. § 1140 (Section 1140) against Defendant MetLife, (4) LTD plan benefits under Section 1132(a)(1)(B) against Defendant MetLife, (6) other equitable relief pursuant to Section 1132(a)(3)(B) against Defendants, (7) attorney's fees under Section 1132(g)(1) against Defendants, (8) "relief requested" against Defendants, (9) breach of contract against Defendant ABC, (10) failure to provide plan policy documents in violation of Section 1132(c)(1)(B) against Defendant MetLife, (11) failure to provide claims denial plan documents in violation of Section 1132(c)(1)(B) against Defendant MetLife, and (12) deceit pursuant to California Civil Code § 1710 (Section 1710) and punitive damages pursuant to California Civil Code § 3294 (Section 3294)

///

---

[4] Plaintiff's Complaint mistakenly numbers causes of action five through eleven as six through twelve. *See generally* ECF No. 1 ("Compl.").  For simplicity's sake, the Court refers to Plaintiff's causes of action as numbered by Plaintiff.

against Defendant MetLife. *See generally* ECF No. 1. Defendants answered the Complaint on September 2, 2015. *See generally* ECF No. 9.

On September 16, 2015, after receiving MetLife's August 25, 2015 letter, Plaintiff filed a motion for a preliminary injunction, seeking to enjoin MetLife from continuing its appellate review of the Second Claim, *see* ECF No. 16, and a motion for entry of default, *see* ECF No. 18. Defendants moved for judgment on the pleadings or summary judgment on November 5, 2015, *see* ECF No. 28, and Plaintiff filed a cross-motion for summary judgment on November 30, 2015, *see* ECF No. 36.

On May 2, 2016, the Court issued an Order: (1) Denying Defendants' and Granting in Part Plaintiff's Requests for Judicial Notice, (2) Granting in Part Defendants' Motion for Judgment on the Pleadings, (3) Granting in Part Plaintiff's Motion for Summary Judgment, (4) Denying as Moot Plaintiff's Motion for Preliminary Injunction, and (5) Denying Plaintiff's Motion for Default. *See generally* ECF No. 56 ("Order"). As for Plaintiff's motions, the Court concluded that Plaintiff had established that A-BC had failed to comply with Section 1132(c)(1)(B) but that "statutory penalties [we]re not warranted in this case," Order at 32–35, and that default was inappropriate given that Defendants had not been properly served and Plaintiff had not been prejudiced given that a decision had been rendered on the merits. *Id.* at 38.

With respect to Defendants' motion, the Court dismissed with prejudice Plaintiff's first, ninth, and twelfth causes of action as preempted by ERISA, *see id.* at 15; dismissed with prejudice Plaintiff's tenth and eleventh causes of action for failing as a matter of law, *see id.* at 17; dismissed with prejudice Plaintiff's third cause of action for failure to state a claim, *see id.* at 18; and dismissed with prejudice Plaintiff's sixth, seventh, and eighth causes of action as remedies rather than claims, *see id.* at 29. The Court then remanded the matter to MetLife "to conduct a proper appellate review pursuant to the Plan documents" and ordered Plaintiff to provide "the authorizations necessary for Defendant MetLife's appellate review." *Id.* at 28.

/ / /

## VII.   Plaintiff's Second Appeal

On May 12, 2016, Plaintiff provided MetLife with a signed authorization form.  *See* AR 2772–2818.  Plaintiff sent letters to MetLife on May 13, 16, and 17, 2016, to initiate the appeal process.  *See* AR 425–810 (May 17, 2016 letter transmitting Kaiser Permanente medical records); AR 2648–2661 (May 16, 2016 letter responding to questionnaire and providing Plaintiff's statement); AR 2662–2747 (May 17, 2016 letter transmitting Best Doctors reports); AR 2749–2771 (May 13, 2016 letter submitting appeal and requesting Plan documents).   By letter dated May 27, 2016, MetLife acknowledged receipt of Plaintiff's appeal request, indicating that it would advise Plaintiff of a decision within forty-five days, unless "special circumstances" required an additional forty-five days.  AR 2250.

On June 1, 2016, Plaintiff wrote to MetLife to enclose "medical records and listing/descriptions of medical problems identified in these records."  AR 2017–2248.  He indicated that he was still waiting to receive "a few medical records" and that he would "submit those as soon as they arrive."  AR 2017.

On June 14, 2016, Plaintiff sent MetLife letters from his ENT, Dr. Trent, and his primary care physician, Dr. Rogers, attesting to his permanent disability.  *See* AR 9–39.  In substance, Dr. Trent's May 25, 2016 letter provided:

> I am an otolaryngologist and I have been seeing Mr[.] Driscoll since 2014.  He has complaints of chronic dizziness, nausea, memory lapses, tunnel vision and fatigue.  I believe these symptoms to be real, not imagined.
>
> The difficulty has been that the many tests we have done to come up with a definitive diagnosis have been unrevealing.  He has undergone CT scans, MRI scans VNG tests, VEMP tests, balance tests, sleep tests.  He has been willing to try any interventions that we could think of such as physical therapy and medications, but all has been unsuccessful.
>
> In fact, he did try to work in the beginning with his disease, but he was unsafe at work, so had to go on disability.

> Sometimes medicine cannot define disease, and I think Mr[.] Driscoll is an example of this. He likely has a primary nervous system disease that gives him his symptoms, and there is no sign of improvement over the years I have known him.

AR 12. Similarly, Dr. Rogers wrote on May 25, 2016:

> Please be advised that Mr. Driscoll has been a patient of mine since August of 2014. Ever since I have met him he has suffered from debilitating dizziness, tinnitus, nausea, difficulty concentrating and fatigue that has made it impossible to work. The symptoms have been going on for almost 3 years and do not show any signs of improvement despite thorough evaluation (including multiple specialist evaluations) and trials of various treatments as indicated in the medical records. Despite the inability to establish a clear cause for his vertigo, nonetheless, he still suffers from this and associated symptoms including tinnitus and nausea. In addition, he has a diagnosis of ADHD and chronic fatigue syndrome which makes it difficult for him to focus and have energy to work. I fully support his application for disability, since in all likelihood, he will be unable to return to work for the long term in his current state.

AR 13. In his June 14, 2016 letter, Plaintiff indicated that he would "provide other information as it becomes available," AR 9, and that he was requesting an additional evaluation from Best Doctors, although it "should not hold up MetLife's Appeal claim processing," AR 10.

## VIII. MetLife's Review of Plaintiff's Second Appeal

MetLife forwarded the information provided by Plaintiff to two independent physicians for review: Dr. Arousiak Varpetian Maraian, a physician board certified in internal medicine and neurology, and Dr. Shailesh Vora, a board-certified psychiatrist and neurologist.

Dr. Maraian's twenty-two-page initial report, dated July 6, 2016, which contains a thorough and accurate summary of Plaintiff's medical records, is reproduced in its entirety below:

/ / /

This review is from an internal medicine and neurology perspective.  The time period under review is from 08/10/2014 forward.

The claimant is a 59 year old male warehouse manager who stopped working on 08/09/2014.  The job involved frequent standing, walking, bending, squatting, and trunk rotation[;] occasional sitting, climbing, balancing, crawling, and driving[;] working at heights and near moving mechanical parts and is classified in "very heavy" demand category.  In a disability form dated 08/26/2014, the claimant slated that he is unable to work due to ringing in ear, fatigue, high blood pressure, palpitations, irritable bowel syndrome (IBS), cognitive difficulties, and other conditions which are not legible.  On 05/15/2016, the claimant wrote a statement in support of his disability listing the following symptoms:  ear pressure and ringing, blurred vision, fatigue and cognitive deficits.  In an appeal letter dated 06/14/2016, the claimant stated that he is having his case reviewed by physician experts.

The claimant saw primary care provider Dr. Bernstein on 05/03/2013.  The claimant complained of chest pressure for a half hour a week prior and ear fullness.  The examination was normal.  The diagnoses were chest pain, common cold, hypertension, and hyperlipidemia.  The claimant was sent for stress test and colonoscopy.

The claimant was seen in urgent care on 05/21/2013.  The claimant complained of chest discomfort for several weeks, an episode of nausea and lightheaded dizziness the day prior, and discomfort in the left axilla.  The examination was normal. The diagnoses were chest pain or discomfort and dizziness.  The claimant was referred to the Emergency Department.

The claimant was hospitalized overnight from 05/21/2013 – 05/22/2013.  Stress echo on 05/22/2013 showed ejection fraction (EF) 65% and was negative for ischemia.  Discharge diagnoses were non-cardiac chest pain, hypertension, dyslipidemia, and attention deficit disorder (ADD).

/ / /

15-CV-1162 JLS (LL)

The claimant saw primary care provider Dr. Bernstein on 05/23/2013.  The claimant reported that he was hospitalized for chest discomfort.  He complained of generalized discomfort and bilateral ear fullness.  He also reported that he was under stress and was being treated by a psychiatrist for ADD with Ritalin. The examination was normal.  The diagnoses were Eustachian tube dysfunction, atypical chest pain with negative stress echo, and stress-related physiological response affecting physical condition.  The claimant was advised to follow-up with the psychiatrist.

The claimant saw primary care provider Dr. Bernstein on 06/18/2013.  The claimant complained of fullness in his ears not improved with medication.  The examination showed slight bulge in the tympanic membranes.  The diagnosis was Eustachian tube dysfunction.  The claimant was referred to ENT.

The claimant saw otolaryngologist Dr. Friedman on 06/26/2013. The claimant complained of ear pain for six weeks, dizziness, nausea, and ringing in his ear.  The examination was normal. Hearing test was administered.  The diagnoses were labyrinthine disorder and Sensorineural Hearing Loss (SNHL).

An MRI of the brain and internal auditory canals on 06/28/2013 was normal.

The claimant saw otolaryngologist Dr. Friedman on 07/03/2013. The claimant complained of nausea and vertigo. MRI was reported normal.  The examination was normal.  The diagnosis was disequilibrium.  The claimant was prescribed physical therapy, steroids and valium.

The claimant was seen in the Emergency Department on 07/09/2013.  The claimant complained of dizziness for five weeks.  The examination showed reproducible vertigo with head turning and was otherwise normal.  Head CT was negative for acute findings.  The diagnosis was acute vertigo.  The claimant was prescribed antibiotics and Antivert.

/ / /

/ / /

16

The claimant saw otolaryngologist Dr. Friedman on 07/10/2013. The claimant complained of light headedness and denied vertigo. The examination was normal. The diagnosis was disequilibrium. The claimant was referred for an electronystagmogram (ENG).

The claimant saw otolaryngologist Dr. Vadapalli on 07/10/2013 for "audio." Hearing test was done. The diagnosis was tinnitus.

The claimant saw primary care provider Dr. Bernstein on 07/11/2013. The claimant complained of clogged ears. ENT did not feel that dizziness was related to the ear. The examination was normal. The diagnoses were dizziness and hypertension. Medications were renewed.

The claimant saw primary care provider Dr. Bernstein [on] 08/09/2013. The claimant complained of constipation and reported that dizziness was somewhat better after the medications for gout were stopped. The examination was normal. The diagnoses were dizziness, normal history and physical (H&P), hypertension, constipation, and gout. Medications were renewed. The claimant was to continue with psychiatrist and neurologist.

A colonoscopy on 10/16/2013 showed colonic polyps, hemorrhoids, and diverticulosis coli. An esophagogastroduodenoscopy (EGD) on the same day showed grade B esophagitis and small hiatal hernia.

The claimant was seen in urgent care on 10/23/2013. The claimant complained of bleeding with bowel movements, abdominal cramping, and vertigo since May. The examination showed hemorrhoids and anal fissure and was otherwise normal. The diagnoses were hemorrhoid and anal fissure. The claimant was prescribed medication.

The claimant saw gastroenterologist Dr. Batah on 10/31/2013. The claimant reported doing well with no new GI symptoms. The examination was normal. The diagnoses were esophagitis, hiatal hernia, diverticulosis, hemorrhoids, and benign polyps of large intestine. Medications were adjusted.

///

The claimant saw neurologist Dr. Cardenas on 12/11/2013.  The claimant complained of fatigue, dizziness and feeling drunk.  The examination was normal including gait and cognitive screen.  MRI of brain and IAC was reported normal.  The diagnosis was vertigo.  The claimant was referred to a specialist.

The claimant saw primary care provider Dr. Tran on 01/02/2014.  The claimant complained of feeling himself spinning and [having a] foggy brain for six months.  The examination was normal.  The diagnoses were dizziness, hypertension, and gastroesophageal reflux disease (GERD).  Medications were adjusted and the claimant was referred to specialists.

The claimant saw neurologist Dr. Gharibshahi on 01/15/2014.  The claimant complained of feeling drunk, ear fullness, nausea with bending and fatigue.  The examination showed no evidence of any distress, normal cognitive screen, normal gait, normal coordination, normal Romberg sign, but decreased vibration sensation on the right arm and leg.  The diagnoses were circadian rhythm sleep disorder, fatigue, sleep disorder, sleep apnea, essential hypertension, obesity, and dizziness.  Dizziness was thought to be non-specific and not due to a neurological condition.  The claimant was to have a sleep study.

Neurologist Dr. Gharibshahi signed a note on 01/24/2014 stating that the claimant is placed off work from 1/23/14 – 2/7/14 for diagnosis of circadian rhythm sleep disorder.

The claimant saw otolaryngologist Dr. Trent on 01/28/2014.  The claimant reported feeling drunk without any vertigo.  Dr. Trent stated that he felt that the claimant had a "CNS problem."  No examination or diagnoses were listed.

Primary care provider Dr. Schneiderman signed a disability form on 01/29/2014 stating that the claimant is unable to work for 16 days starting on 01/23/2014 due to "serious health condition[."]

The claimant underwent "Unattended Sleep study" on 02/04/2014 and the test showed no evidence of sleep disordered breathing.

///

The claimant underwent vestibular testing on 02/05/2014 with the audiology department.   The results are not available. Posturography on 02/05/2014 was normal.

The claimant saw otolaryngologist Dr. Trent on 02/06/2014. Dr. Trent stated that the balance testing was normal and that there was no evidence of an inner ear problem.  No examination was recorded.   The diagnosis was dizziness.   The claimant was referred to physical therapy.

The claimant saw primary care provider Dr. Tran on 02/21/2014. The claimant reported that he was working two jobs and variable shifts.  The examination was normal including the vital signs. The diagnoses were hypertension and attention deficit hyperactivity disorder (ADHD).   The antihypertensive medication and Ritalin were renewed.

The claimant saw primary care provider Dr. Tran on 03/10/2014. The claimant complained of feeling drunk, ringing in his ear, nausea, and intermittent heart racing.  The claimant reported inability to work.  The examination was normal.  The diagnoses were palpitations, dizziness, nausea, and essential hypertension. The claimant was kept out of work until he saw the neurologist.

A CT of the thorax on 03/10/2014 was done for recurring nausea and showed minimal lingular scarring, aortic and atherosclerosis.

The claimant saw neurologist Dr. Gharibshahi on 03/14/2014. The claimant complained of fatigue and irregular sleep times. The examination was normal including gait and cognitive function. The diagnoses were lack of adequate sleep, fatigue and hypertension.  The claimant was advised [on] sleep hygiene and cognitive behavior therapy.

The claimant was evaluated by the physical therapist on 03/14/2014.  The claimant reported bilateral ear ringing, feeling drunk, walking into walls, and having crashed a car at work.  The claimant also complained of right sided weakness and constant dizziness.  The claimant reported that he quit his job since 2/28 because of ringing in his ears.  The examination showed unsteady gait,  impaired  Romberg,  and  normal  muscle  strength.

Oculomotor and vestibular testing was normal. The assessment was that the claimant ha[d] VOR delay and needed therapy for impaired visual tracking with head movements.

Cardiac event monitor from 03/21/ 2014 – 04/01/2014 showed sinus rhythm associated with various symptoms.

The claimant saw primary care provider Dr. Tran on 04/04/2014. The claimant complained of constipation, nausea, and inability to work. The examination was normal. The diagnoses were constipation, benign prostatic hyperplasia (BPH), hiatal hernia, and nausea. The claimant was referred to GI and was kept out of work for 2 weeks.

The claimant saw gastroenterologist Dr. Go on 04/14/2014. The claimant reported that he had nausea for years, had constipation, and had lost weight "probably due to decreased by mouth (po) intake and decreased beer intake." The examination was normal with no evidence of any distress. The diagnoses were chronic nausea probably functional or related to GERD, abdominal bloating and constipation most likely functional or IBS, hypertension, and BPH. Tests and medications were ordered.

A CT of the abdomen and pelvis on 04/14/2014 showed a hepatic cyst, aortic atherosclerosis, and degenerative changes of thoracolumbar spine.

On 04/17/2014 during his 3rd visit with physical therapy, the claimant met his goal of no loss of balance or dizziness increase with cervical range of motion. The claimant reported that he was considering permanent disability and the goal of operating a forklift by 05/09/2014 was removed.

The claimant saw otolaryngologist Dr. Trent on 04/19/2014. The claimant complained of feeling drunk. The claimant reported that he had had testing by specialists and the results were negative. The examination was normal with no evidence of any distress and normal gait. The diagnoses were dizziness, sleep disorder, and sleep apnea. The claimant was prescribed antibiotics because he reported that antibiotics helped his symptoms.

The claimant saw primary care provider Dr. Tran on 04/28/2014. The claimant complained of feeling constipated despite having soft bowel movements. He complained of low back pain because of daily bowel movements. He complained of ongoing nausea and dizziness and inability to work because of nausea. The examination showed tenderness on the back and a hemorrhoid. The diagnoses were irritable bowel syndrome, hemorrhoid, constipation, and back pain due to constipation. The claimant was advised to follow-up with GI.

The claimant had his 4th of 8 physical therapy sessions on 05/05/2014 and asked to be discharged. The claimant met two of three goals and was independent with a home exercise program. Dynamic gait index was outside fall risk range.

The claimant was seen in the Emergency Department on 05/11/2014 for red eye on the left since the morning. The eye examination was done. The blood pressure was normal. The visual acuity was 20/20 with both eyes. The claimant was discharged home with eyedrops and diagnoses of left subconjunctival hemorrhage and left corneal abrasion.

The claimant saw gastroenterologist Dr. Go on 06/02/2014. The claimant complained of ongoing constipation and said that the medications d[id]n't work. The examination was normal with no evidence of any distress. The diagnoses were chronic nausea probably functional or related to GERD, abdominal bloating and constipation most likely functional or IBS, hypertension, and BPH. Medications were adjusted.

The claimant's file was reviewed by otolaryngologist Dr. Strasnick on 06/19/2014 who determined that the claimant most likely has Meniere's disease but could also have vertiginous migraines, recurrent vestibulopathy, superior canal dehiscence syndrome, BPPV, or metabolic dysfunction. Dr. Strasnick suggested additional tests. In an undated follow-up summary, Dr. Strasnick recommended an MRI with CISS sequence and depending on what it showed, vascular decompression of the 8th cranial nerve.

/ / /

/ / /

The claimant saw primary care provider Dr. Tran on 06/23/2014. The claimant asked to review the report from Dr. Strasnick from Bert Doctors.  Dr. Tran stated that Meniere's was ruled out by work-up with ENT and neurology.  The claimant inquired about his hypertension.  The vital signs were normal.  The diagnoses were dizziness and hypertension.  Renogram was ordered.

NM captopril renogram on 06/24/2014 showed no evidence of renal artery stenosis.

The claimant saw sleep specialist Dr. Manthena on 06/30/2014. The claimant reported that he was previously diagnosed with obstructive sleep apnea (OSA), but did not use continuous positive airway pressure (CPAP) machine.  The examination was normal.  The sleep study was reviewed which showed AHI 4 and no circadian rhythm problem.  The diagnosis was dizziness.  The claimant was referred for an attended sleep study and to a headache specialist.

The claimant saw otolaryngologist Dr. Trent on 07/09/2014.  The claimant complained of feeling drunk.  Testing suggested by the consultant from Best Doctors was ordered.  The diagnosis was dizziness and tests were ordered.

The claimant underwent overnight polysomnogram with CPAP titration study on 07/09/2014.  The results showed mild to moderate OSA with AHI of 15 and effective treatment of sleep disordered breathing with CPAP.

CT of temporal bones on 07/22/2014 showed no significant abnormality.

The claimant had a hearing test on 07/23/2014 and it showed asymmetrical high frequency sensorineural hearing loss right greater than left.

The claimant saw sleep specialist Dr. Manthena on 07/25/2014. The claimant reported that he felt worse with CPAP.  The examination was normal.  The diagnosis was OSA.  Dental device was ordered.

///

15-CV-1162 JLS (LL)

The claimant saw neurologist Dr. Potrebic on 07/28/2014. The claimant complained of cognitive difficulties, occasional mild headaches, and sensitivity to light and sound. The examination showed no distress, normal gait including tandem gait, negative Romberg, and negative Dix Hallpike maneuver. The diagnosis was vertigo with no evidence of migraines and normal examination. No new testing or treatment was advised.

The claimant saw primary care provider Dr. Rogers on 08/06/2014. The claimant reported that he has had problems for 15 months with balance, nausea, hearing loss, tinnitus, diarrhea, constipation, dizzy spells, and palpitations. He reported that the testing has not revealed abnormalities. The examination was normal including no evidence of any distress, no nystagmus, normal heart exam and normal gait and speech. The diagnoses were palpitations, nausea, dizziness, hypertension, and bilateral subjective tinnitus. The claimant was referred to cardiology. Medications were adjusted and the claimant was advised 3 months of disability for work-up of his symptoms.

The primary care provider, Dr. Rogers signed a disability form on 08/11/2014 for time off work through 11/2/14 for "absence plus treatment."

The claimant had a Holter monitor from 08/11/2014 until 08/29/2014. The results were normal and complaints of palpitations were consistent with normal sinus rhythm (NSR).

Vestibular evoked potential response was done on 08/20/2014. Results are not provided.

The claimant saw sleep specialist Dr. Manthena on 08/22/2014. No complaints or examination was recorded. The diagnosis was OSA. Prevent was ordered.

The claimant saw primary care provider Dr. Rogers on 09/03/2014. The claimant reported no changed in dizziness and nausea. He complained of cognitive deficits, fatigue and fluctuation in his heart rate. The examination showed no distress, normal speech and gait, and rash on the chest. The diagnoses

///

were contact dermatitis, dizziness, fatigue, and cognitive deficit. Medications were adjusted.

The claimant saw otolaryngologist Dr. Trent on 09/05/2014. The claimant reported constant nausea and feeling drunk without vertigo. Previous studies were reviewed. The diagnosis was nausea and MRI of IAC was ordered.

The claimant saw specialist in allergy and immunology Dr. Huynh on 09/08/2014. The claimant complained of plugged ears, nausea, dizziness, and fatigue for 15 months. The examination was normal. The diagnosis was bilateral Eustachian tube dysfunction. Allergy testing was planned.

The claimant saw Dr. Rosado-Cosme in urgent care on 09/11/2014. The claimant complained of rapid heart rate a day after weaning off metoprolol. The heart rate was 94 and the examination was normal with no evidence of any distress. The diagnoses were supraventricular tachycardia, uncontrolled hypertension, and chronic fatigue syndrome. The claimant was treated with metoprolol and was discharged home.

MRI of internal auditory canals on 09/29/2014 showed no significant abnormality.

The claimant saw gastroenterologist Dr. Go on 10/13/2014. The claimant reported that constipation had improved by stopping medication. The examination was normal with no evidence of any distress. The diagnoses were chronic nausea probably functional or related to GERD, abdominal bloating and constipation most likely functional or IBS, hypertension, and BPH. No changes were made to the treatment plan.

The claimant saw primary care provider Dr. Rogers on 10/22/2014. The claimant requested work slip extension and complained of ringing in his ears, dizziness and nausea. The examination showed no evidence of any distress. The diagnoses were hypertension, ADHD, dizziness, and nausea. No changes were made to the treatment plan. Disability was extended.

///
///

15-CV-1162 JLS (LL)

The primary care provider, Dr. Rogers[,] signed a disability form on 11/06/2014 for time off work through 01/14/2015 for "absence plus treatment."

The claimant saw primary care provider Dr. Rogers on 01/08/2015. The claimant complained of chronic nausea and vomiting three-four times per week. The claimant also complained of feeling drunk, chronic fatigue, lack of energy, and daily palpitations. He reported that he drove short distances. The examination showed no evidence of any distress, normal gait, no nystagmus and normal heart and lung exam. The diagnoses were chronic fatigue syndrome, dizziness, and nausea. The primary care provider considered the claimant permanently disabled because he had had no improvement in his subjective symptoms.

Otolaryngologist Dr. Strasnick from Best Doctors wrote a follow-up opinion on 01/09/2015 stating that the claimant needs additional testing for inner ear process, neuropsychological testing, and repeat CPAP titration study.

The primary care provider, Dr. Rogers[,] signed a disability note on 01/14/2015 for time off work through 07/14/2015 for diagnoses of dizziness and nausea.

Psychiatrist Dr. Elig wrote a letter on 01/15/2015 stating that the claimant was first evaluated on 09/27/2010 for history of inattention and impulsivity and was already successfully treated with stimulant medication. The letter states that the psychiatrist confirmed the previous diagnosis of ADHD and continued treatment with Ritalin. The letter states that the last contact with the claimant was on 02/07/2014.

Social Security Administration stated in a letter dated 02/26/2015 that the claimant is not disabled.

The claimant saw primary care provider Dr. Rogers on 05/22/2015. The claimant reported no change in dizziness. The examination was normal. The diagnoses were hypertension, ADHD, atherosclerosis of aorta, GERD, and gout. Lab tests were ordered.

/ / /

The claimant saw otolaryngologist Dr. Trent on 05/22/2015. The claimant complained of feeling drunk. The previous imaging studies were reviewed. The diagnosis was dizziness. Dr. Trent stated that "all relevant testing" was done.

Social Security Administration reconsidered the claimant's case in a letter dated 05/26/2015 and determined that the claimant is not disabled.

The primary care provider, Dr. Rogers[,] signed a disability form on 06/25/2015 for time off work through 01/15/2016 for "serious health condition requiring follow up and treatment" and for dizziness.

Brain MRI on 07/21/2015 was "unremarkable."

The claimant underwent videonystagmogram and balance testing on 10/07/ 2015. The results were normal.

The claimant saw otolaryngologist Dr. Trent on 10/12/2015. The claimant reported dizziness, falls, walking into things, poor hearing, and cognitive deficits. "Recent VNG" was reported normal. Examination was not included. The diagnoses were dizziness and bilateral hearing loss. Dr. Trent stated that he spoke with the consultant with Best Doctors who suggested antidepressants. The claimant was prescribed nortriptyline.

The claimant saw primary care provider Dr. Rogers on 12/14/2015. The claimant complained of injuring his right shoulder during a fall 3 months prior and ongoing dizziness and palpitations. The claimant reported that he had not started the antidepressant prescribed by Dr. Trent. The examination was normal. The diagnoses were right shoulder joint pain, hypertension, OSA, ADHD, dizziness, gout, and palpitations. The claimant was referred to cardiology and orthopedics.

The claimant saw orthopedic surgeon Dr. Otarodifard on 12/16/2015. The claimant complained of right shoulder pain for 4 months after a fall at home. The examination showed normal strength and sensation. The diagnoses were right shoulder

///

15-CV-1162 JLS (LL)

subacromial bursitis and cuff tendinopathy.  The claimant was treated with an injection and was referred to therapy.

The claimant saw primary care provider Dr. Rogers on 03/22/2016.  The claimant reported feeling better on antibiotics and steroids for bronchitis.  The examination was normal with no evidence of distress and normal gait.  The diagnoses were hypertension, ADHD, dizziness, gout, and atherosclerosis of aorta.  Medications were adjusted.

The claimant was seen in urgent care on 04/28/2016.  The claimant complained of pain on his scalp for five days and redness for two days.  The claimant also complained of right neck and shoulder pain for 1 day.  The examination showed redness over the right forehead.  The diagnoses were scalp cellulitis and neck sprain.  The claimant was prescribed oral antibiotics.

The claimant went to the Emergency Department on 04/30/2016.  The claimant complained of facial swelling, neck pain, and scalp cellulitis.  He reported no improvement with antibiotics.  The examination showed no distress, mild erythema and swelling over the right tarsal plate, and was otherwise normal.  The claimant was diagnosed with face cellulitis and right trapezius strain.  He was treated with vancomycin.

The claimant was seen in the Emergency Department on 05/01/2016.  The claimant complained of right scalp pain and redness for a week.  He reported worse swelling with oral antibiotics.  The examination showed red rash and swelling around the right periorbital area, with no pustules or vesicles, and right cervical lymphadenopathy.  The diagnosis was cellulitis and was prescribed home infusion of vancomycin.

The claimant was seen in Urgent care on 05/02/2016.  The claimant reported right periorbital cellulitis spreading over the scalp for the prior week, not responding to oral antibiotics.  He complained of pain.  The examination showed right periorbital erythema extending into the right forehead and scalp and was otherwise normal including normal gait.  The diagnosis was right periorbital and facial cellulitis.  The claimant was discharged home with antibiotics.

The claimant saw infectious disease specialist Dr. Shapiro on 05/05/2016.  The claimant complained of right sided facial pain 10 days prior followed by redness and swelling.  The claimant reported improvement with IV antibiotics.  The examination showed minimal erythema and resolving vesicles.  The diagnosis was face cellulitis thought to be due to zoster infection.  The dose of vancomycin was increased.

The claimant was administered home infusion of antibiotics through 05/09/2016.

The claimant saw infectious disease specialist Dr. Shapiro on 05/09/2016.  The claimant reported no more facial pain and redness with IV antibiotics.  The examination was normal with no evidence of any distress.  The claimant was to complete the last two doses of antibiotics for facial cellulitis.

The primary care provider, Dr. Rogers[,] wrote a letter on 05/25/2016 stating that he was a patient of his since August 2014 and he suffers from debilitating dizziness, tinnitus, nausea, difficulty concentrating, and fatigue and is unable to work.  The letter states that the claimant is also unable to work from ADHD and chronic fatigue syndrome.

Otolaryngologist Dr. Trent wrote a letter on 05/25/2016 stating that he has followed the claimant since 2014 and the claimant has complained of chronic dizziness, nausea, memory lapses, tunnel vision, and fatigue since then.  Dr. Trent stated that the claimant's symptoms are not imagined although testing has been unrevealing and his condition must be due to "primary nervous system disease[."]  The letter states that the claimant is unsafe at work and shows no sign of improvement.

**Physician Contact Log**

. . .

**Discussion with Attending Provider**

As of this writing the Attending Providers Dr. Strasnic, Dr. Trent, Dr. Batah and Timothy Nunn have not returned my calls.

15-CV-1162 JLS (LL)

Chris, the nurse[,] called back on 06/17/2016 and said that Dr. Mathena last saw the claimant in August 2014 and has not seen him since.

Dr. Rogers said that the primary problem that keeps the claimant out of work is the dizziness and vertigo present for several years. Dr. Rogers said that ENT has not been able to confirm a specific etiology and the claimant has not been able to work or drive. Dr. Rogers said that the claimant does not use a cane or walker and has not had falls or frequent vomiting. Dr. Rogers said that he last saw the claimant in March 2016 and the claimant follows ENT regularly. Dr. Rogers said that the claimant drives short distances[,] has nausea and dizziness, and has diagnosis of ADHD which is not the primary issue with ability to work.

I [spoke] with Sonia, MA for Dr. Bernstein. She said that the claimant last saw Dr. Bernstein in August 2013 and the claimant was seen once more in November 2013 by Dr. Asuncion and has not been seen there since.

**Questions and Reviewer's Response**

1. Does the medical information support functional limitations due to a physical condition or combination of physical conditions as of 08/10/2014? (Please address all medical evidence in the file in your review including the reports and opinions of the treating physician including any evidence provided in support of the claimant's subjective complaints and functional restrictions and limitations)

A. If yes, identify with specificity the types of functional restrictions and limitations the claimant had as of 08/10/2014? (Functional limitations include any reduction in ability to work full time and if unable to work full time please specify the number of hours a day and the number of days per week the claimant can work.)

B. Describe the specific diagnosis and clinical findings/data noted in the records in support of functional limitations. Please list each document referred to above including: Provider's

/ / /

Name, Specialty, Date of Visit Diagnosis, Subjective Symptoms, and Clinical and Diagnostic Findings

C. Specify whether the function.al restrictions and limitations identified as existing as of 08/01/2014 continue through the present date.

D. If no, please describe using above format.

The medical information provided does not support any impairment due to a condition within the disciplines of internal medicine and neurology as of 08/10/2014 to the present.

The records show that the claimant complained of chest pressure in May 2013 and was hospitalized. No cardiac disease was found. Around the same time, the claimant complained of lightheadedness and dizziness with nausea and gastrointestinal symptoms. The claimant also described the sensation as feeling drunk. The claimant was evaluated by an otolaryngologist and a neurologist and no abnormality was found. The gastroenterologist diagnosed the claimant with esophagitis, hiatal hernia, diverticulosis, hemorrhoids, and colonic polyps. The claimant changed his health plan at the end of 2013.

The claimant complained of dizziness and nausea with constipation to the new medical team at Kaiser starting in early January 2014. The claimant was evaluated by neurologist Dr. Gharibshahi who did not find any evidence of imbalance on examination and determined the claimant's symptoms to be due to poor sleep and OSA. The claimant underwent testing and was diagnosed with mild to moderate OSA. Treatment with CPAP treated the sleep apnea but the claimant was non-compliant with the treatment.

The claimant was evaluated by otolaryngologist Dr. Trent. Examination and testing did not reveal any abnormality to account for the claimant's symptoms. The dizziness was determined not to be due to an inner ear condition.

The claimant was evaluated by the physical therapist on 03/14/2014. The claimant only attended to four of eight

recommended sessions and asked to be discharged. At discharge on 05/5/2014, the claimant had met two of three goals and was independent with a home exercise program. Dynamic gait index was outside fall risk range. The last goal of driving a forklift was discontinued because the claimant reported that he would not be returning to work.

The claimant saw neurologist Dr. Potrebic on 07/28/2014 for possible migraine related dizziness and was diagnosed with vertigo with no evidence of migraines and normal examination.

The claimant complained of palpitations and had a Holter monitor from 08/11/2014 until 08/29/2014. The results were normal and complaints of palpitations were recorded as NSR.

The claimant was followed by gastroenterologist Dr. Go for constipation and nausea. By 10/13/2014, constipation had improved and the chronic nausea was thought to be probably functional or related to GERD.

Psychiatrist Dr. Elig wrote a letter on 01/15/2015 stating the claimant was treated for ADHD with Ritalin since before 2010 and through 2014.

Otolaryngologist Dr. Strasnick from Best Doctors reviewed the claimant's records in 2014 and in 2015. Based on the available records, Dr. Strasnick initially thought that the most likely etiology of the symptoms was Meniere's disease. Meniere's disease was ruled out by the first ENT evaluation in 2013 and by the second ENT evaluation in 2014. Upon follow-up opinion on 01/09/2015, Dr. Strasnick stated that the claimant needs additional testing for an inner ear process, neuropsychological testing for a psychological condition, and repeat CPAP titration study. In the last ENT clinical note dated 10/12/15, otolaryngologist Dr. Trent stated that he spoke with the consultant with Best Doctors who suggested antidepressants. The claimant reported to primary care provider Dr. Rogers on 12/14/2015 that he had not started the antidepressant.

The claimant saw orthopedic surgeon Dr. Otarodifard on 12/16/2015 for right shoulder subacromial bursitis and cuff

tendinopathy. The claimant complained that he had hurt his shoulder after a fall at home.

In May 2016, the claimant went to the Emergency Department and urgent care several times for cellulitis and was seen by the infectious disease specialist Dr. Shapiro. Dr. Shapiro's diagnosis was face cellulitis thought to be due to zoster infection. The claimant was treated with home IV antibiotics and the cellulitis resolved.

The claimant has stated that he is out of work due to dizziness, nausea, and cognitive difficulties. The records lack evidence to support that the claimant's complaints cause him any impairment of function. The claimant has been found to have normal examination by multiple providers. Despite the complaint of dizziness, the claimant has always had a normal gait on exam and normal tandem gait when tested. Physical therapy evaluation demonstrated that dizziness improved with treatment and the claimant was not at risk for falls. Despite complaining that he had falls, the claimant was never seen walking with an assistive device such as a cane or a walker. There is no evidence that dizziness impairs the claimant's function.

The claimant complained of chronic nausea unchanged with antiemetics. There is no documentation that the claimant had any impairment from nausea such as poor intake of solids or liquids. The records demonstrated no unintended weight loss or treatment for dehydration.

There is no evidence of any cognitive deficits. Cognitive screen by the various providers documented in the records was normal. No formal neuropsychological testing was performed. The included records show that the claimant had enough cognitive abilities to start a lawsuit against several parties without the representation of an attorney.

2. Are there medication side effects noted in the medical record that would warrant restrictions and limitations as of 08/10/2014?

/ / /

/ / /

15-CV-1162 JLS (LL)

A. If yes, reference the specific and detailed clinical information that you relied upon, which supports your conclusions, and provide specific restrictions and limitations as applicable.

B. Which medications are causing the side effects?

C. What are the impairing side effects?

D. How long has the claimant been experiencing side effects?

There is no documentation of any side effect to medication from 08/10/2014 onward.

**Assessment/Rationale**

This review is from an internal medicine and neurology perspective.

The claimant is a 59 year old male.

The records show that the claimant complained of chest pressure in May 2013 and was hospitalized. No cardiac disease was found. Around the same time, the claimant complained of lightheadedness and dizziness with nausea and gastrointestinal symptoms. The claimant also described the sensation as feeling drunk. The claimant was evaluated by an otolaryngologist and a neurologist and no abnormality was found. The gastroenterologist diagnosed the claimant with esophagitis, hiatal hernia, diverticulosis, hemorrhoids, and colonic polyps. The claimant changed his health plan at the end of 2013.

The claimant complained of dizziness and nausea with constipation to the new medical team at Kaiser starting in early January 2014. The claimant was evaluated by neurologist Dr. Gharibshahi who did not find any evidence of imbalance on examination and determined the claimaint's symptoms to be due to poor sleep and OSA. The claimant underwent testing and was diagnosed with mild to moderate OSA. Treatment with CPAP treated the sleep apnea but the claimant was non-compliant with the treatment.

/ / /

The claimant was evaluated by otolaryngologist Dr. Trent. Examination and testing did not reveal any abnormality to account for the claimant's symptoms.  The dizziness was determined not to be due to an inner ear condition.

The claimant was evaluated by the physical therapist on 03/14/2014.   The claimant only attended to four of eight recommended sessions and asked to be discharged.  At discharge on 05/05/ 2014, the claimant had met two of three goals and was independent with a home exercise program.  Dynamic gait index was outside fall risk range.  The last goal of driving a forklift was discontinued because the claimant reported that he would not be returning to work.

The claimant saw neurologist Dr. Potrebic on 07/28/2014 for possible migraine related dizziness and was diagnosed with vertigo with no evidence of migraines and normal examination.

The claimant complained of palpitations and had a Holter monitor from 08/11/2014 until 08/29/2014.  The results were normal and complaints of palpitations were recorded as NSR.

The claimant was followed by gastroenterologist Dr. Go for constipation and nausea.   By 10/13/2014, constipation had improved and the chronic nausea was thought to be probably functional or related to GERD.

Psychiatrist Dr. Elig wrote a letter on 01/15/2015 stating the claimant was treated for ADHD with Ritalin since before 2010 and through 2014.

Otolaryngologist Dr. Strasnick from Best Doctors reviewed the claimant's records in 2014 and in 2015.  Based on the available records, Dr. Strasnick initially thought that the most likely etiology of the symptoms was Meniere's disease.  Meniere's disease was ruled out by the first ENT evaluation in 2013 and by the second ENT evaluation in 2014.  Upon follow-up opinion on 0l/09/2015, Dr. Strasnick stated that the claimant needs additional testing for an inner ear process, neuropsychological testing for a psychological condition, and repeat CPAP titration study.   In the last ENT clinical note dated 10/12/2015,

otolaryngologist Dr. Trent stated that he spoke with the consultant with Best Doctors who suggested antidepressants. The claimant reported to primary care provider Dr. Rogers on 12/14/2015 that he had not started the antidepressant.

The claimant saw orthopedic surgeon Dr. Otarodifard on 12/16/2015 for right shoulder subacromial bursitis and cuff tendinopathy. The claimant complained that he had hurt his shoulder after a fall at home.

In May 2016, the claimant went to the Emergency Department and urgent care several times for cellulitis and was seen by the infectious disease specialist Dr. Shapiro. Dr. Shapiro's diagnosis was face cellulitis thought to be due to zoster infection. The claimant was treated with home IV antibiotics and the cellulitis resolved.

The claimant has stated that he is out of work due to dizziness, nausea, and cognitive difficulties. The records lack evidence to support that the claimant's complaints cause him any impairment of function. The claimant has been found to have normal examination by multiple providers. Despite the complaint of dizziness, the claimant has always had a normal gait on exam and normal tandem gait when tested. Physical therapy evaluation demonstrated that dizziness improved with treatment and the claimant was not at risk for falls. Despite complaining that he had falls, the claimant was never seen walking with an assistive device such as a cane or a walker. There is no evidence that dizziness impairs the claimant's function.

The claimant complained of chronic nausea unchanged with antiemetics. There is no documentation that the claimant had any impairment from nausea such as poor intake of solids or liquids. The records demonstrated no unintended weight loss or treatment for dehydration.

There is no evidence of any cognitive deficits. Cognitive screen by the various providers documented in the records was normal. No formal neuropsychological testing was performed. The included records show that the claimant had enough cognitive

///

15-CV-1162 JLS (LL)

abilities to start a lawsuit against several parties without the representation of an attorney.

AR 855–876.

Dr. Vora's initial report, dated July 18, 2016, read:

**CHART REVIEW**

May 3, 2013, 56-year-old male with a left ear pain.  Evaluated at FACEY.

He had electrocardiogram on May 21, 2013.  Normal.

On May 21, 2019, chest pain, hypertension, Attention Deficit Disorder, on Ritalin for a long time, and had Dyslipidemia with statin intolerance as per Dr. Long, MD.  However, his troponin was normal, electrocardiogram was normal on May 21, 2013.

June 18, 2013, he had a follow up for eustachian tube dysfunction.

. . .

July 9, 2013, seen at Providence Medical Center for acute vertigo.

July 11, 2013, follow up for dizziness and elevated blood pressure.

January 2, 2014.  He was seen by Kaiser Permanente.  C-reactive protein was 9.1.

January 9, 2014, progress note.   Seen at Kaiser Permanente.  Diagnosis was dizziness and sleep apnea.

January 15, 2014, had dizziness, tightness in the chest, he said his dizziness was like with a drunk person.

February 21, 2014, seen at Kaiser Permanente.   Had hypertension, Attention Deficit/Hyperactivity Disorder, nausea.  Patient was requesting Zofran.

. . .   On March 14, 2014, he was seen at Kaiser.  History of dizziness started in May of 2013 after he woke up one day with tightness in the upper body, complaint of fatigue, feeling drunk, works long hours seven days a week, works odd hours.  His sleep hygiene is poor.  Sleep time 6:00 p.m. to 3:30 a.m.  Diagnosed with obstructive sleep apnea.  Multiple naps during the day. Inconsistent sleep and wake time.

March 28, 2014, his fall risk, score 16/24, less than 19/24 is a fall screen.  He is a fall risk.

On May 5, 2014, fall risk score 20/24, again less than 19/24 is a fall risk.  So . . . it looks like his gait imbalance was better after physical therapy, May 5, 2014.

June 23, 2014, he had CT, but on that day he had nuclear medicine kidney imaging, with vascular flow and function.  He was also given Captopril.  It demonstrated no evidence to suggest any renal artery stenosis.

He had a hearing test done on July 23, 2014.  It showed asymmetrical, high-frequency sensorineural hearing loss, right more than left.

CT of the temporal bone, 2014, and MRI scan normal, EMG normal.

The hearing evaluation on July 28, 2014, at Kaiser Permanente, . . . states that in May of 2013, while sitting in the office, the whole top of his body from the waist up felt like it was being squeezed, and he was passing gas and burping.  That day he felt like he had drank five beers, nonspecific dizziness for 24/7.  The next morning, when he got up he felt like he was spinning, misjudged the car in front of him, and hit the car.  When he stopped walking, he fell forward.  He felt spinning sensation has also never gone away.   The degree of spinning has never changed.  It does not matter if he is moving or not, what position he is in, he can be perfectly still and still be spinning.  After he eats, his sensation feels worse.  He feels pressure in his ears, ringing, he has some hearing loss.   He works in a loud

environment and has not passed a hearing test in the last five years, as of July 28, 2014.  No syncope.  He has gone through a windshield crash, bicycle, has been hit by horse in the head, but now produced dizziness, noting a numbness, weakness, no diplopia, no dysarthria, and no ptosis.  He is not better in a moving car.  Complex visual stimulation "freaks him out" as per the note, and he has been through vestibular training and physical therapy, which have helped him a lot.

In June 2014, seen again at Kaiser Permanente for balance problem, nausea, dizziness, vomiting, hearing loss, occasional tinnitus, right greater than left.  Seen by neurologist[;] ear, nose, and throat[;] and gastrointestinal specialists over the last 15 months.  Alternating diarrhea and constipation.

Next note on August 20, 2014, he had a Vestibular Evoked Potential done.  Results are not consistent with superior canal dehiscence.

His vestibular evoked potential was done on August 22, 2014.  I have the graph, but need the report.

CT of the temporal bone was done to rule out any acoustic neuroma, but it was reported as normal.

His list of medical problems as of September 8, 2014, are as follows:  Obesity with a body mass index of 30 to 39.9, essential hypertension, gastroesophageal reflux disease, anxiety disorder, sleep disorder, sleep apnea, hypertension, Attention Deficit/Hyperactivity Disorder, atherosclerosis of the aorta, benign prostatic hyperplasia, hiatal hernia, dizziness.

September 12, 2014, bilateral eustachian tube dysfunction and evaluation at Kaiser Permanente.

He was diagnosed on September 11, 2014, with supraventricular tachycardia, uncontrolled hypertension, and chronic fatigue syndrome by Dr. Rafael Angel, MD.

///

///

15-CV-1162 JLS (LL)

On October 13, 2014, evaluation at Kaiser Permanente showed assessment as follows:  Chronic nausea, probably functional, abdominal bloating, and constipation most likely from irritable bowel syndrome, hypertension, benign prostatic hyperplasia.

October 20, 2014, he was evaluated at Kaiser Permanente for persistent dizziness and nausea.  At that time, his active problems are as follows:  Obesity with body mass index 30 to 39.9, essential hypertension, gastroesophageal reflux disease, anxiety disorder, sleep disorder, sleep apnea, hypertension, Attention Deficit/Hyperactivity Disorder, atherosclerosis of the aorta, benign prostatic hyperplasia, hiatal hernia, dizziness, and chronic fatigue syndrome.

January 8, 2015, seen at Kaiser Permanente for follow up.  He continues feeling chronic nausea, vomiting three to four times a week, constant drunk feeling which gets worse when he does even minimal activity such as walking half a block.  Reports chronic fatigue, lack of energy, palpitations daily, usually shortly 10 to 15 minutes without any shortness of breath.

There is a note by him on March 30, 2015, that he had tried to walk and was unable to walk because of his medical issues, mainly dizziness, balance, equilibrium, vertigo, palpitations, fatigue, and heating loss and the above medical problems listed in my active problems.

MRI of the brain unremarkable as of July 21, 2015.

December 16, 2015, seen at Kaiser Permanente.  Right shoulder pain.

January 15, 2015, as per Dr. Steven Elig.  Patient has been seen for longstanding history of ADHD and treated with stimulant medication, first evaluation done on September 27, 2010.

May 5, 2016, seen for face cellulitis.  He was seen at Kaiser Permanente.

January 9, 2014, dizziness.

/ / /

July 29, 2014, asymmetric hearing per test.  Asymmetric high-frequency sensorineural hearing loss, right more than left.

Request - cognitive evaluation an2/15d VEP (8/22/14) report.

By cognitive evaluation, I mean any neuropsychiatric evaluation, any memory evaluation, even a Mini-Mental Status examination to check his cognition/memory would be helpful.

**CALLS TO TREATING PROVIDERS**

The call to the attending physicians, Dr. Steven Elig.  His telephone number is (858) 454-4256.

The next attending physician is Best Doctors, phone number (617) 426-3666.

These phone calls have been made on Tuesday, July 12, at around 11:00 a.m.  On July 13, at around 4:00 p.m., and another phone call on July 14 at 11:40 a.m.

**DISCUSSION**

Questions to be addressed:

1)     *Does the medical information support cognitive functional limitations due to a cognitive condition or combination of cognitive conditions as of August 10, 2014?   Please address all medical evidence in the file in your review, including the reports and opinions of the treating physician, including any evidence provided in support of the claimant's subjective complaints and functional restrictions and limitations.*

The cognitive functional limitations of impaired memory, decreasing the orientation, alertness/higher cortical functions are not supported.  None of these notes that I have reviewed support the cognitive functional limitations.  It all talks about those active problems of disequilibrium, dizziness, chronic fatigue syndrome, hypertension, sleep apnea, obesity, and some palpitations

/ / /

for a few minutes every day, and all other active problems as mentioned in the notes above.

2)   *If yes, specify the types of limitations the claimant would have.*

N/A

3)   *Describe the specific, clinical findings/data noted in the records in support of cognitive limitations.  Please list each document referred to above, including provider's name, specialty, date of visit, and clinical findings.*

No data to support cognitive limitations.

4)   *What is the etiology of the cognitive limitations?*

N/A

5)   *Please specify the time periods during which the claimant would have had these cognitive limitations.  If no, please respond, using the above format.*

N/A

6)   *Are there medication side effects noted in the medical record that would warrant cognitive restrictions and limitations as of August 10, 2014?  If yes, reference the specific and detailed clinical information that you relied upon which supports your conclusions and provide specific restrictions/limitations as applicable.*

No medication side effects noted in the medical record that would warrant cognitive restrictions or limitations as of August 10, 2014.

7)   *Which medications are causing the side effects?*

N/A

8)   *What are the impairing side effects?*

N/A

9)      *How long has the claimant been experiencing side effects?*
        *If no, please respond using the above format.*

N/A

AR 877–882.

In the meantime, Plaintiff continued to submit additional materials in support of his appeal. On June 27, 2016, Plaintiff sent MetLife approximately 200 pages of additional documentation, including several personal statements from his daughter, sister-in-law, and himself; medical records; and an updated list of illnesses. *See* AR 1814–2011. Plaintiff added that he was "still waiting to get you a personal statement from my sister Kathleen McAlpine and a summary of diagnosed medical opinions (i.e. Vertigo vs. Meniere's...), a summary of Kaiser medical, a statement from my neurologist Dr. Gharibshahi, an updated FMLA form and as previously mentioned and if we get lucky enough, a new evaluation by Best Doctor's." AR 1814.

On July 8, 2016, MetLife informed Plaintiff that, "[w]hile waiting for the additional information that [Plaintiff] wants to submit to have considered for [his] appeal, the appeal review has been placed in a tolling status (waiting status)" and requested that Plaintiff "[p]lease have the above information submitted within 45 days of this letter or August 22, 2016." AR 1612. MetLife added that, "[o]nce the requested information is received or the 45 days (August 22, 2016) has expired [MetLife] will continue with [its] review of [Plaintiff's] claim with the information already in [his] claim file." *Id.* Finally, MetLife "advised that upon receipt of the requested information [it] may need an additional 45 days to render a decision on the appeal." *Id.*

On July 13, 2016, Plaintiff submitted another approximately 100 pages of information to be considered in his appeal, including a medical summary, a list of each medical provider and diagnosis, a medical diagnosis summary, a summary of treating doctors, a personal statement from his sister, and a new report from Best Doctors. AR

1677–1774.  Plaintiff added that he was "still waiting to get [MetLife] a statement from [his] neurologist Dr. Gharibshahi, and an updated FMLA form."  AR 1677.

On July 20, 2016, Plaintiff submitted "a statement from [his] neurologist Dr. Gharibshahi" and "withdr[e]w the FMLA form from consideration."  AR 1649–1675.  "Therefore, [MetLife] now ha[s] all the information [Plaintiff] need[ed] to submit.  To date, everything [Plaintiff] wish[es] to be considered for this appeal has been supplied and therefore, tolling should be stopped."  AR 1649.

On July 29, 2016, MetLife informed Plaintiff that it had received Plaintiff's July 20, 2016 letter on July 25, 2016, and had resumed its review of his appeal on July 26, 2016.  AR 1610.  Further, "[a]s previously advised to [Plaintiff] in the letter dated July 8, 2016 upon receipt of the information [MetLife] advised [Plaintiff] that [MetLife] may need an additional 45 days to render a decision on the appeal.  The additional information that [Plaintiff] submitted will be referred to the Independent Physician Consultants[] for further review and that is the reason for the extension."  *Id.*

On August 18, 2016, MetLife wrote to Plaintiff to request additional information for its appeal review.  AR 1546.  Specifically, MetLife noted that, "[i]n part of the records from Kaiser Permanente . . . , there is a record referencing you had a Vestibular/Balance Test on August 20, 2014 and there is a record titled 'Vestibular Evoked Potential Report.'"  *Id.*  MetLife asked Plaintiff to "confirm if there is a report available for the Vestibular Evoked Potential (VEP) that was done in August 2014" and inquired whether he would "be providing the report to MetLife to be considered for [his] appeal."  *Id.*  MetLife also asked Plaintiff to "confirm if at any time [he] ha[s] had a cognitive evaluation, neuropsychiatric evaluation, memory evaluation and/or a mini-mental status examination to check [his] cognition/memory" and, "[i]f so, will [he] be providing the medical report(s) to MetLife to be considered for [his] appeal?"  *Id.*  Plaintiff subsequently provided the requested reports, *see* AR 1548–1576, 1583–1597, and recent medical records, *see* AR 1540–42.

/ / /

On September 19, 2016, after reviewing the additional materials submitted by Plaintiff, Dr. Maraian issued a ten-page supplemental report. *See* AR 887–897. Dr. Maraian's supplemental report concluded that the additional information did not change his original findings:

**Clinical History**

This is a re-review from an internal medicine and neurology perspective. Please see my initial report dated 07/06/2016 and RRS Case #30216004521 for a complete clinical history.

Additional documentation was submitted for review.

The claimant is a 59 year old male warehouse manager who stopped working on 08/09/2014. The claimant's records were reviewed by myself previously. At that time, the records reflected that the claimant was not impaired in function in relation to his complaints of dizziness, nausea and cognitive deficits. Additional records are reviewed in the new set of records.

The claimant underwent vestibular testing on 02/05/2014 with the audiology department. He complained that he felt spinning and felt drunk, that he had fullness in his ears and felt nauseated when bending forward. He reported that he had not fallen. VAT testing revealed "high vertical phase" which suggested oscillopsia with fast movements. Motor testing showed that the claimant placed most of the weight on the left leg with center of gravity more on the left, and latency response was reported abnormal. Overall SOT portion of posturography was normal.

The claimant saw neurologist Dr. Gharibshahi on 03/14/2014. He complained of fatigue and irregular sleep times. The claimant had a 10-day sleep log which showed that he took "multiple short naps before bedtime during the day." The naps were 30-60 minutes long and once the nap was 2.5 hours long in the evening with very late sleep onset that night. The claimant did not have a consistent wake time according to the sleep log. The examination was normal including gait and cognitive function. The assessment was that the claimant's usual sleep time was 6pm

to 3:30 am and that there was evidence of circadian rhythm disorder on his Actigraph. The diagnoses were lack of adequate sleep, fatigue and hypertension. The claimant was advised sleep hygiene and cognitive behavior therapy and insomnia class.

An incomplete telephone encounter note with sleep specialist Dr. Manthema on 08/14/2014 shows that the claimant had a sleep study. The results of the report are cut off.

Vestibular evoked potential response on 08/20/2014 showed no superior canal dehiscence. Asymmetry was not detected, therefore, results were reported normal.

The claimant saw sleep specialist Dr. Manthena on 08/22/2014. No complaints or examination was recorded. MATRx dental device could not be prescribed because of poor fit due to misalignment of lower teeth. The claimant was tested with Provent device and overall mild obstructive sleep apnea (OSA) or hypopnea syndrome was detected with the sleep disordered breathing only during supine sleep. Sleep positioner was advised to prevent supine sleep. The diagnosis was OSA. Provent was ordered and the claimant was advised to sleep on his side.

The primary care provider, Dr. Rogers wrote a letter dated 05/25/2016 staling that he treated the claimant since August 2014 and the claimant has been debilitated with dizziness, tinnitus, nausea, difficulty concentrating and fatigue ever since. The letter states that the doctor supports long term disability because the symptoms have not improved despite extensive testing. The letter states that in addition to vertigo of unknown etiology, the claimant is diagnosed with attention deficit hyperactivity disorder (ADHD) and chronic fatigue syndrome which cause difficulty focusing and lack of energy.

The claimant's family members wrote letters on 06/13/2016 and on 06/27/2016 stating that the claimant has occasions of dizziness, confusion and nausea, walks slowly and is uncoordinated. The letters state that the claimant does not participate in family functions over the last three years. The letters state that the claimant has had bruises on his head and face from unexplained injury and has had falls.

The claimant's file was reviewed by otolaryngologist Dr. Goebel with Best Doctors on 07/13/2016.  The opinion was that the most probable diagnoses were Meniere's disease or vestibular migraine.  The recommendation was for the claimant to have an electrocochleography to evaluate for Meniere's disease and to try intratympanic steroid injection for treatment of Meniere's.  The claimant was also advised to follow up with a neurologist and with physical therapy for migraines and imbalance respectively.

The claimant's file was reviewed for disability by a psychiatrist on 07/18/2016.

The claimant saw primary care provider Dr. Rogers on 08/08/2016.  After Visit Summary and not the clinical note is included.  Complaints and examination are not noted.  The "health problems reviewed" were dizziness, ADHD, hypertension, and edema.  Hydrochlorothiazide was started.

Psychiatrist Dr. Elig wrote a letter on 08/12/2016 stating that he has not treated the claimant since his last contact on 02/07/2014 and he is not aware that the claimant had any neuropsychological testing.

**Physician Contact Log**

. . .

**Discussion with Attending Provider**

Dr. Trent called back and said that the claimant complains to him that he feels drunk all the time and because of it he can't work.  Dr. Trent said that he evaluated the vestibular system extensively and can't give him a diagnosis.  Dr. Trent said that he performed intratympanic dexamethasone injection at the last visit and he has not yet heard back whether it helped or not.  Dr. Trent said that the claimant is sincere about his symptoms, but he has found nothing abnormal on examination or on testing.

/ / /

/ / /

**Questions and Reviewer's Response**

Please try to contact the treating providers you initially tried to have a teleconference with but were unable to speak with at the time they include Or. Strasnic, Trent, Go, and Batah.  Also, please clarify in your initial report if the date you spoke with Dr. Rogers was on 06/17/2016?

Call log as above.  I did speak with Dr. Rogers on 06/17/2016 according to my previous report.

1. In your initial report you note in part Vestibular evoked potential (VEP) response was done on 08/20/2014.  Results were not provided.  Please note there was information in the file and the provider Kaiser provided information in response to Appeal Specialist request to clarify if there was a report for the VEP from August 2014.  Please comment on the VEP response dated 08/20/2014.

Vestibular evoked potential response on 08/20/2014 showed no superior canal dehiscence.  Asymmetry was not detected, therefore, remits were reported normal.

A. After review of the additional information provided along with any teleconference that were completed for this addendum report please advise if the information changes or alters your prior assessment/findings if the medical information supports functional limitations due to a physical condition or combination of physical conditions as of 08/10/2014.

The information in the additional notes reviewed and the information from the teleconference do not change my previous assessment in regard to the claimant's function from 08/10/2014 onward.  There is no new information that shows any abnormal findings on examination or on testing from 08/10/2014 onward. Vestibular testing on 02/05/2014 showed oscillopsia with fast movements and that the claimant placed most of the weight on the left leg with center of gravity more on the left.  However, overall SOT portion of posturography was normal.  These findings on the test do not explain the claimant's symptoms of constant dizziness, ear fullness and cognitive deficits.  At the

47

time of the test in February 2014, because of the findings on the test, the claimant should have been restricted from climbing ladders or working at unprotected heights for safety reasons. There are no abnormal findings on testing or examination from 08/10/2014 onward.

B. If yes or no please explain and provide your rationale and the clinical evidence supporting your conclusion(s).

The information in the additional notes reviewed and the information from the teleconference do not change my previous assessment in regard to the claimant's function from 08/10/2014 onward.  There is no new information that shows any abnormal findings on examination or on testing from 08/10/2014 onward. Vestibular testing on 02/05/2014 showed oscillopsia with fast movements and that the claimant placed most of the weight on the left leg with center of gravity more on the left.  However, overall SOT portion of posturography was normal.  These findings on the test do not explain the claimant's symptoms of constant dizziness, ear fullness and cognitive deficits.  At the time of the test in February 2014, because of the findings on the test, the claimant should have been restricted from climbing ladders or working at unprotected heights for safety reasons. There are no abnormal findings on testing or examination from 08/10/2014 onward.

2. Please also advise if the additional information provided for the addendum review changes or alters your prior assessment/findings for the time period under review as of 08/10/14 regarding if there are medication side effects noted in the medical record for the time period in question that would warrant restrictions and limitations.

A. If yes or no please explain and provide your rationale and clinical evidence supporting your conclusion(s).

There is no documentation in the new records provided of any side effects to medication as of 08/10/2014 onward.

/ / /

/ / /

**Assessment/Rationale**

This is a re-review from an internal medicine and neurology perspective.

The claimant is a 59 year old male.

The records show that the claimant has been out of work since 2013 and has ongoing complaints of dizziness or feeling drunk as the reason for not working. Extensive review of the records previously and the addendum provided currently do not support ongoing impairment of function due to dizziness. No neurological or medical (internal medicine) condition has been found by the multiple specialists to explain the claimant's complaints. The examination has been normal with no evidence of any imbalance or cognitive changes. The information in the additional notes reviewed and the information from the teleconference do not change my previous assessment in regard to the claimant's function from 08/10/2014 onward.

AR 887–891.

Dr. Vora provided her supplemental report on September 9, 2016. *See* AR 898–900. Dr. Vora similarly was not persuaded by the additional information to change her original conclusion:

**DISCUSSION**

. . .

All information sent to me was reviewed.

. . .

*After your review of the additional information provided and the attempt to have a teleconference with AP at Best Doctors please advise if any additional medical information provided changes or alters your prior assessment/findings if there is functional restrictions and limitations for the time period under review as of 8/10/14 related to any cognitive/memory issues reported by the clmt. If yes or no please explain and provide your rationale and/or the clinical evidence supporting your conclusion(s).*

> I do not have any further report on any cognitive/memory issues. Regarding further restrictions and limitations due to cognitive/memory issues, after reviewing the additional reports, I do not have any new restrictions, limitations, or recommendations.
>
> *Please also advise if the additional information provided for the addendum review changes or alters your prior assessment/findings for the time period under review as of 8/10/14 regarding if there are medication side effects noted in the medical record for the time period in question that would warrant restrictions and limitations. If* yes *or no please explain and provide your rationale and clinical evidence supporting your conclusion(s).*
>
> After reviewing the records, there are no side effects in the medical records for the time in question that would warrant any different restrictions or limitations.

AR 898–899.

On September 26, 2016, MetLife sent copies of Dr. Vora's and Dr. Maraian's initial and supplement reports to Plaintiff's treating physicians, "including Dr. Trent, Dr. Rogers, Dr. Go, Dr. Mathena, Dr. Karimdad, Dr. Shapiro, Dr. Gharibshahi, Dr. Nunn, Dr. Bernstein and Dr. Barry Strasnick," AR 1496, asking that they send their comments and clinical evidence if they disagreed with the conclusions by October 10, 2016, *see also* AR 933–975 (Dr. Rogers), 976–1021 (Dr. Trent), 1022–1067 (Dr. Go), 1068–1114 (Dr. Manthena), 1115–1160 (Dr. Gharibshahi), 1161–1206 (Dr. Nunn). MetLife also sent a letter to Plaintiff informing him and requesting that he "[p]lease contact the above provider(s) to ensure they received this information and to confirm if they will be submitting any responses." AR 1496. Plaintiff responded on October 2, 2016 that "[a]ny follow-up on [MetLife's] faxes/requests/communications with doctors or insurance companies and their policy statements regarding what they do or don't allow respectfully needs to be done by MetLife, not [Plaintiff]. . . . This seems to be [MetLife's] responsibility, not [Plaintiff's]." AR 1417. MetLife responded on October 18, 2016, that

"MetLife submits IPC(s) reports to treating providers[] as a courtesy to [Plaintiff] as MetLife has no control or authority over if [Plaintiff's] physicians[] submit any response or additional information."  AR 852.  MetLife added that, "[i]f there is no response(s) and/or additional information submitted by [Plaintiff] and/or [his] providers by November 1, 2016 [MetLife] will move forward with rendering an appeal decision and [it] will notify [Plaintiff] when [its] determination of [his] appeal review is complete."  AR 853.  No responses were received.

On November 4, 2016, MetLife rendered its decision to uphold its February 19, 2015 determination.  *See* AR 836–847.  Specifically, MetLife wrote:

> According to the information in your claim file, you worked as a Warehouse Manager for Anheuser-Busch Companies, LLC from November 4, 1989 through August 9, 2014.  Based on the information provided, this position involved frequent standing, walking, bending, squatting, trunk rotation, occasional sitting, climbing, balancing, crawling, and driving, and required you to work at heights and to be around moving mechanical parts.
>
> If entitled to benefits, your LTD benefit start date following the Plan's six-month Elimination Period would be February 6, 2015.  By letter dated February 19, 2015 MetLife notified you that your LTD benefit was denied.  The letter explained that after a review of the information submitted in support of your claim of disability under the Plan, it was determined you did not meet the Definition of Disability throughout the entire Elimination Period and beyond.  The letter further explained while there were reports of dizziness, nausea and ear pressure, the submitted studies including VNG, ENG and audiometry, a brain MRI and physical exam notes, did not document physically impairing conditions which would result in an impairment.  Therefore it was determined that the available medical information provided was insufficient to support a finding that you were unable to work while continuing evaluation and further treatment of your reported symptoms during the period in question.  Therefore, you did not qualify for LTD benefits for the period beginning February 6, 2015, going forward.  The letter also advised you how to appeal MetLife's claim determination.

///

You appealed MetLife's adverse determination and on multiple occasions during this appeal review you submitted subsequent letters (June 1, 2016, June 27, 2016, July 13, 2016, July 20, 2016, September 8, 2016, October 2, 2016, October 5, 2016 and October 20, 2016) along with personal statements from you and family members as well as additional medical records that you wanted to have considered for your appeal.  We have considered everything submitted.  This information included but was not limited to several hundred pages of medical records including letters dated May 25, 2016 from your treating physicians Drs. Rogers and Trent, office visit notes from various providers, test results, diagnostic imaging results, and consultation reports.  The medical records were also from various providers including but not limited to Kaiser Permanente, Best Doctors, Allied Health, Facey Medical Group and Urgent Care/Emergency Department visits, medical descriptions gathered through the Center for Disease Control and their subsequent links, noting usually through the Mayo Clinic or WebMD.  The dates of service also varied, from dates prior to your reported date of disability of August 10, 2014, through dates into the current year.

You reported at the time of your claim of disability, August 10, 2014, that you had been having problems for approximately 15 months with balance, nausea, hearing loss, tinnitus, diarrhea, constipation, dizzy spells and palpitations.  You also reported testing had not revealed abnormalities.  At the time of your claim of disability you saw your primary care physician, Dr. Rogers.  Dr. Rogers' examination was normal, and it noted no evidence of any distress; no nystagmus, normal heart exam and normal gait and speech.  The diagnoses were noted as palpitations, nausea, dizziness, hypertension, and bilateral subjective tinnitus.  You were referred to cardiology.  Medications were adjusted and you were advised 3 months of disability for work-up of your symptoms.  Other conditions and symptoms noted in your claim file related to the time period under review include but are not limited to your report of difficulty recalling names, facts and simple math, headaches, occasional vomiting, palpitations, abdominal issues; vertigo, obesity, fatigue, irritable bowel syndrome (IBS), GERD, sleep disorder, sleep apnea, atherosclerosis of Aorta, Attention Deficit/Hyperactivity Disorder (ADHD), BPH (Benign Prostatic Hypertrophy), hiatal

hernia, dyslipidemia, gout, mild concentric left ventricular hypertrophy, supraventricular tachycardia, anxiety, and stress. Based on the medical records available in your claim file you have seen multiple specialists for your symptoms and medical conditions.

By letter dated May 27, 2016 MetLife advised you the appeal review started.  However as noted above you submitted numerous subsequent letters and additional medical records at various times throughout this appeal review.

Thereafter, MetLife had your entire claim file reviewed by two independent physicians; one, Dr. Arousiak Varpetian Maraian, who is Board Certified in Neurology and Internal Medicine; and two, Dr. Shailesh Vora, who is Board Certified in Neuropsychiatry. We asked Dr. Varpetian Maraian and Dr. Vora to opine as to whether the medical information contained in the file provided clinical evidence of functional limitations and restrictions from the time period of your reported date of disability of August 10, 2014, forward with respect to the medical conditions as noted in your claim file.

On June 17 and June 24, 2016 the independent physician, Dr. Varpetian Maraian attempted to speak with the following physicians: Drs. Strasnick, Mathena, Rogers, Trent, Go, Batah, Bernstein and Nunn.  Messages were left and no return call was received from Drs. Strasnick, Trent, Batah and Nunn.

The independent physician was able to speak with Dr. Mathena's nurse on June 17, 2016 who stated you were last seen in August 2014 and you had not been seen since.

The independent physician was also able to speak with Dr. Rogers.  Dr. Rogers opined that the primary problem that kept you out of work was the dizziness and vertigo present for several years.  Dr. Rogers also stated that the Ear, Nose and Throat specialist had not been able to confirm a specific etiology and that you reported that you had not been able to work or drive. Dr. Rogers further stated you did not use a cane or walker and you had no falls or frequent vomiting.  Also he stated that you drove short distances and also had nausea and dizziness, in

addition you had the diagnosis of ADHD which Dr. Rogers opined this was not the primary issue with your ability to work.

The independent physician spoke with Dr. Bernstein's medical assistant who stated you last saw Dr. Bernstein in August 2013 and you were seen once more in November 2013 by a Dr. Asuncion and you had not been seen since.

In summary after a review of the medical records provided in your claim file and the teleconferences as noted above the independent physician Board Certified in Neurology/Internal Medicine opined the medical information did not support any impairment due to a condition within the disciplines of internal medicine and neurology as of August 10, 2014 to the present.

In her report, Dr. Varpetian Maraian set forth the following for the time period in question regarding complaints of palpitations. A Holter Monitor was prescribed from August 11, 2014 until August 29, 2014. The results were normal and complaints of palpitations were recorded as [normal sinus rhythm].

You were followed by gastroenterologist Dr. Go for constipation and nausea. By October 13, 2014, constipation had improved and the chronic nausea was thought to be probably functional or related to GERD.

Psychiatrist Dr. Elig wrote a letter on January 15, 2015 stating you were treated for ADHD with Ritalin since before 2010 and through 2014.

Otolaryngologist Dr. Strasnick from Best Doctors reviewed your records in 2014 and in 2015. Based on the available records, Dr. Strasnick initially thought that the most likely etiology of your symptoms was Meniere's disease. However, Meniere's disease was ruled out by the first Ear, Nose and Throat (ENT) evaluation in 2013 and by the second ENT evaluation in 2014. Upon following up opinion [sic] on January 9, 2015, Dr. Strasnick opined you needed additional testing for an inner ear process, neuropsychological testing for a psychological condition, and repeat CPAP titration study. The independent physician notes in the last ENT clinical note dated October 12,

54

2015, otolaryngologist[] Dr. Trent stated that he spoke with the consultant with Best Doctors who suggested antidepressants.  It was reported that you advised your primary care physician, Dr. Rogers on December 14, 2015 that you had not started the antidepressant.

You saw an orthopedic surgeon, Dr. Otarodifard on December 16, 2015 for right shoulder subacromial bursitis and cuff tendinopathy.  It was noted that you complained that you had hurt your shoulder after a fall at home.  There was nothing further noted regarding your shoulder or the fall at home.

In May 2016 there was documentation that you went to the Emergency Department and urgent care several times for cellulitis and you were seen by the infectious disease specialist, Dr. Shapiro.  Dr. Shapiro's diagnosis was face cellulitis thought to be due to zoster infection.  You were treated with home IV antibiotics and the cellulitis was reported as resolved.

The independent physician went on to note you stated you were out of work due to dizziness, nausea, and cognitive difficulties.  The independent physician opined the records lack evidence to support that your complaints cause any impairment of function.  The independent physician explained you had been found to have normal examination by multiple providers and despite your complaints of dizziness, the records provided note that you have always had a normal gait on exam and normal tandem gait when tested.  In addition physical therapy evaluation demonstrated that dizziness improved with treatment and you were not at risk for falls.  Also despite complaining that you had falls, it was not documented in the records that you were seen walking with any type of assistive device (for example, a cane or walker).  In addition there is no evidence that dizziness is impairing and although you also have complaints of chronic nausea and it is unchanged with antiemtics, there is no documentation that you had any impairment from nausea such as poor intake of solids or liquids.  The records demonstrated no unintended weight loss or treatment for dehydration.  The independent physician also opined that there is no evidence provided to support any cognitive deficits and cognitive screens by various providers[] documented in the records were normal.  The independent

physician pointed out that there was no formal neuropsychological testing included in the records, opined there was no documentation of any side effects to medication for the time period in question, and noted that from a review of the record it appears you have sufficient cognitive abilities. The independent reviewer added in part that her review and opinion as noted in her report is based on the information available for review and is held to a reasonable degree of clinical accuracy.

On July 12, 13 and 14, 2016 the independent physician, Dr. Vora Board Certified in Neuropsychiatry attempted to speak with Dr. Steven Elig, psychiatry and physicians at Best Doctors[;] messages were left and no return call was received.

In summary after a review of the medical records provided in your claim file the independent physician Board Certified in Neuropsychiatry opined regarding your cognitive ability there was no cognitive functional limitations of impaired memory, decreasing orientation, alertness/higher cortical functions supported. The independent physician explained there was no information provided to support cognitive functional limitations for the time period under review. The records noted active problems of disequilibrium, dizziness, chronic fatigue syndrome, hypertension, sleep apnea, obesity and some palpitations for a few minutes every day, and all other active problems as mentioned in her report.

The independent physician also opined there was no medication side effects noted in the medical record that would warrant cognitive restrictions and limitations for the time period under review as of August 10, 2014. After the initial reports were completed, you contacted MetLife by letter dated June 27, 2016 and stated you were in the process of gathering additional information you wanted to have considered for your appeal review. By letter dated July 8, 2016 MetLife advised you since you were waiting on additional information to submit to MetLife for your appeal your appeal review was placed in a tolling status (waiting status) in order to provide you with additional time to submit the additional information. MetLife requested any additional information to be submitted by August 22, 2016. The letter further explained once the requested information was

received or the 45 days (August 22, 2016) expired we would continue with our review of your claim.  By letter dated July 20, 2016 you advised MetLife that you now had submitted all the information that you wanted to submit for your appeal review and therefore tolling should be stopped.  By letter dated July 29, 2016 MetLife confirmed tolling had stopped and the appeal review resumed as of July 26, 2016.

We requested the independent physicians[] review the additional information submitted and advise if this information changed or altered their prior assessment/findings for the time period under review.

The independent physician Board Certified [in] Neuropsychiatry submitted an addendum report dated September 8, 2016 and advised she attempted another call to the Best Doctors to discuss your case.  The representative stated she was unable to find out to whom the independent physician should speak regarding your case.  The reviewing physician notes she did not have any further report on any cognitive/memory issues and there were no restrictions and limitations due to cognitive/memory issues after a review of the additional information submitted.  Therefore, the independent physician opined the additional information submitted did not change or alter her prior assessment/findings for the time period under review.

The independent physician Board Certified in Neurology/Internal Medicine also reviewed the additional information submitted and provided an addendum report dated September 19, 2016.  The reviewing physician stated in part that she attempted to speak with Drs. Strasnick, Trent, Go, and Batah.

Messages were left for Dr. Strasnick and no return call was received.  Dr. Go's office stated you had not been seen since October 13, 2014 and the reviewing physician was unable to leave a message for Dr. Batah as the message received stated the number was not set up to receive calls.

The reviewing physician stated that she was able to speak with Dr. Trent.  Dr. Trent advised her that you reported to him that you felt drunk all the time and because of that you cannot work.

Dr. Trent also stated that he evaluated the vestibular system extensively and can't give you a diagnosis and that he performed intratympanic dexamethasone injection at the last visit and he had not yet heard back from you as to whether it helped or not. Dr. Trent further stated that it was his opinion that you were sincere about your symptoms, but that he has found nothing abnormal on examination or on testing.

After review of the additional information submitted and the teleconference with Dr. Trent, the reviewing physician noted the vestibular evoked potential response on August 20, 2014 showed no superior canal dehiscence.  Asymmetry was not detected therefore results were reported to be normal.  The independent physician further added the information in the additional notes reviewed and the teleconference with Dr. Trent did not change her previous assessment in regard to your function as of August 10, 2014, onward.  The reviewing physician explained there is no new information that shows any abnormal findings on examination or on testing from August 10, 2014 onward.  Also the Vestibular testing on February 5, 2014 showed oscillopsia with fast movements and that you placed most of the weight on the left leg with center of gravity more on the left.  However, overall SOT [Sensory Organization Test] portion of posturography was normal.  The reviewing physician opined these findings on the test do not explain your self-reported symptoms of constant dizziness, ear fullness and cognitive deficits.  However, the reviewing physician did opine at the time of the test in February 2014, because of the findings you should have been restricted from climbing ladders or working at unprotected heights for safety reasons but there are no abnormal findings on testing or examination from the date of disability of August 10, 2014, onward.  The reviewing physician also stated there is no documentation in the new records that were provided of any side effects to medication as of August 10, 2014, onward.

On August 16, 2016 we received a letter dated August 12, 2016 from Dr. Elig.  Dr. Elig advised he is not aware of any neuropsychological or psychoeducational testing that you completed and that he has not treated you since your last contact on February 7, 2014.

///

58

15-CV-1162 JLS (LL)

To ensure that we had considered everything in relation to your claim of disability under the Plan, we faxed each of the reports to each of Drs. Trent, Rogers[], Go, Mathena, Karimdad, Shapiro, Gharibshahi, Nunn, Bernstein and Strasnick. We asked each doctor to review the reports and if they disagreed with the reports to submit any comments or additional medical information to support their conclusions. We requested a response by October 7, 2016. Please note we were advised that the physicians at the Best Doctors would not have anything to do with disability as they are strictly a remote service offered by your employer and everything is strictly over the phone and you are not actually physically seen by one of their doctors and there are no physical exams. The representative further explained to MetLife that their physicians' review the medical records and make recommendations therefore their physicians would have no comment on or nothing to do with your disability claim.

By letter dated September 23, 2016 we advised you the independent physicians' reports were faxed to the above mentioned providers and requested that you contact these providers to ensure they received this information and to confirm if they will be submitting any responses. In addition we advised you that if you would like MetLife to fax the reports to any other treating providers not listed above, for you to provide MetLife with the name and fax number of the physicians you would like to receive these reports. We also requested that you provide this information as soon as possible to MetLife so that there would be no delay in the appeal review.

By letter dated October 2, 2016 you responded to MetLife and stated in part that you would reply to the issues brought up in the letter you received from MetLife and then at a later date you would respond to the rest of the letter. You wrote that you were dumbfounded that MetLife would request that you intervene on MetLife's behalf for information that was sent to your doctors/insurance companies and that MetLife did not send you these communications. In addition you explained that you had previously communicated to your doctors to cooperate fully with MetLife and in every way possible. You report you signed a release and provided MetLife with their contact information and that your physicians are aware of your appeal. You added any

follow up on faxes/requests/communications with doctors or insurance companies and their policy statements regarding what they do or do not allow needs to be done by MetLife, and not by you.

By follow up letter dated October 5, 2016 you noted in part that not knowing what the independent physician reports are you did not know which doctors or other medical providers should receive/respond to the reports mentioned in the prior letter from MetLife.   You added that you felt many of your medical providers you previously provided to MetLife were missed.  In your letter you provided some examples.  In closing you also noted you were working on responding to the rest of MetLife's prior letter but that you wanted to make MetLife aware of what you felt was an oversi[ght].

By letter dated October 18, 2016 we responded to the above mentioned letters.  In part it was explained that as a courtesy to you, the claimant, MetLife submits independent physician reports to treating providers for review and we provide the treating providers the opportunity to submit any comments and or additional information if they are in disagreement with the independent reviewer(s) assessment.   MetLife has no control over or authority to require that your physicians[] submit any responses or additional information.  We reminded you that this is your appeal review and that is why it was suggested that you follow up with your physicians to the extent that you deem is appropriate.  In addition we explained that according to the list of providers previously provided that you were correct there were many on the list and in our attempt to fax the reports we reviewed your file and provided the reports to the providers that were relevant to the time period under review.  Also, we wanted to provide you with the opportunity to contact MetLife if you wanted to have the reports shared with any other providers that you felt were relevant to your claim of disability and your appeal. In addition, we also advised you that we attempted to contact some of the other physicians (i.e., Drs. Vadapalli, Freidman, Potrebic and Rafael Quinonez) and the representative from these providers' offices confirmed you were last seen prior to the time period under this appeal review.

/ / /

Also enclosed with our October 18, 2016 letter we provided you with a copy of both reports from the independent physicians; due to the number of pages in the reports this was completed in three separate submissions to you on October 18, 2016.  In addition, since it was unclear at that time whether any of your providers were going to be submitting a response, and to provide you a sufficient opportunity to review the reports and determine whether any other provider(s) should receive the reports, we provided you with additional time to submit any response and/or additional information that you wanted to have considered as part of your appeal review.  We requested a response by November 1, 2016 and advised that if no additional information or response was received we would move forward with rendering a determination of the appeal.  As of the date of this letter the only response received was your letter dated October 20, 2016 in which you state you disagreed with MetLife's assessment that additional time should be provided.  You mentioned your prior concern regarding tolling periods, expectations, and what you felt MetLife's past delays were.

During the review of the claim file, and as part of our effort to ensure that everything was considered, we provided you and your providers· additional time to submit any comments and or additional medical records to be considered for your appeal.  As noted above since the start of this appeal review you submitted several hundred pages of additional medical records in addition to subsequent letters all at various times during the appeal review.  In the course of reviewing a file when additional information is submitted at various times it is reasonable that MetLife would need additional time to review the additional information submitted to ensure a full and fair review is conducted.  Therefore your several submissions at various times during the appeal review process impacted MetLife's ability review and otherwise move forward with complete a decision prior to the date of this letter.

MetLife is required to adjudicate claims of disability under the Plan pursuant to the terms of the Plan.  The determination of disability is not solely based on your diagnoses, but on your functional capabilities related to your symptoms reported by you and substantiated by your healthcare providers' medical records.

15-CV-1162 JLS (LL)

When evaluating the impact that your diagnoses had on your ability to function, we took into account all of the medical diagnoses noted in your claim file and we have reviewed the entire claim file.  Also in the review, we acknowledge and we have considered your complaints, concerns as noted in your appeal request letter and any subsequent letters you submitted during the appeal review as well as the personal statements from you and your family members that you submitted in addition to your treating physicians' opinions along with the denial notice from the Social Security Administration in relation to your denied claim of disability as a result of your claim for Social Security Disability Income benefits.  We also took into consideration the independent physicians' reviews.  While we do not discount you have medical conditions as noted in your claim file and that you seek medical treatment and take medications, the clinical evidence available for review does not support a finding that these medical conditions whether singular or in combination rose to a level that were impairing as of your date of disability throughout the Elimination Period, and beyond.  Therefore, you did not meet the Definition of Disability as required by the Plan and as such you do not quality for LTD benefits February 6, 2015, forward.

In conclusion we have reviewed the claim file and found that your conditions as noted in the file and for which you are claiming disability for are not disabling as defined by the Plan.  The medical documentation in the file does not support any functional restrictions and limitations for the time period under review.  Therefore the adverse determination of your claim under the Plan was appropriate and will remain and no LTD benefits are due or payable February 6, 2015, forward.

AR 838–846.

## IX.    The Instant Litigation

On November 18, 2016, Plaintiff filed a motion to reopen this case, *see generally* ECF No. 58, contending that "MetLife [had] failed to conduct a full and fair review, as ordered by this Court on May 02, 2016," *id.* at 1.  The Court granted Plaintiff's motion on June 8, 2017, *see generally* ECF No. 76, "conclud[ing] that Plaintiff should have an opportunity to present to the Court his grievances with Defendant MetLife's appellate

review," *id.* at 2.  Defendants filed their motion for judgment on September 18, 2017, *see generally* ECF No. 80, to which Plaintiff failed to respond.  The Court therefore took the motion under submission, *see* ECF No. 89, and set the case for a hearing for dismissal for failure to prosecute on May 17, 2018, *see* ECF No. 91.

At the May 17, 2018 hearing, the Court set a new hearing schedule, ordering the Parties to file their motions by August 6, 2018, and their replies by August 27, 2018.  *See* ECF No. 98.  Defendants timely filed their Motion on August 6, 2018, *see generally* ECF No. 107, but Plaintiff did not.  The Court therefore set a new briefing schedule, requiring Plaintiff to file his Motion by August 17, 2018, and the Parties to file their replies by September 10, 2018.  *See* ECF Nos. 110, 113.

Plaintiff timely filed his Motion, *see generally* ECF No. 118, to which Defendants objected as exceeding the Court-ordered page limits, *see* ECF No. 119.  Defendants filed their reply on September 10, 2018.  *See* ECF No. 120.  Plaintiff objected to Defendants' reply, *see* ECF No. 122, to which Defendants filed another objection, *see* ECF No. 123.

On March 21, 2019, the Court noted that, "[i]n [their] objections to Plaintiff's evidence, *see* ECF No. 120-1, Defendants reference two Requests for Judicial Notice served by Plaintiff, which have been neither lodged nor filed with the Court."  ECF No. 125 at 1.  The Court therefore ordered Plaintiff to file his requests for judicial notice.  *See id.* at 1–2.

On September 23, 2019, the Court received a Notice of Change of Address from Plaintiff, *see* ECF No. 126, indicating that "[t]he last mailing [he had] received from this court was dated 10/29/2018," *id.* at 2.  Because Plaintiff had not received a copy of the Court's March 21, 2019 Order, the Court directed the Clerk of Court to mail a copy to Plaintiff at his updated address and ordered Plaintiff to file his requests for judicial notice within seven days of receipt.  *See* ECF No. 127.  On October 21, 2019, Plaintiff filed a document titled Request for Judicial Notice of Plaintiff's Exhibits in Support of Opening Brief Version Two as Required by Court Order Document 125, *see generally* ECF No. 129, in which Plaintiff responded to certain of Defendants' arguments and added:

> Plaintiff is unsure as to what evidence this Court requires Plaintiff to declare in this judicial notice because I thought I always provided judicial notification of all exhibits since this Court brought that issue to both Plaintiff and Defendant in order dated May 02, 2016 (Dkt56). Nonetheless, Defendants objection (Dk# 120 p 2) included references to Plaintiff's Exhibits 250, 260, 270 and 301 served on August 18, 2018 and Exhibits 56, 58, 91, 250, 270, 301, 301A, 301B and 304 served on August 23, 2018. Every one of these documents, with exception of 303 (Vestibular Disorders Association), had been previously served to Defendants.

*Id.* at 5. Although the Court has located Plaintiff's Exhibits 91, *see* ECF No. 74, and 250, 260, 270, and 301, *see* ECF No. 114, as of the date of this Order, the Court does not believe that it is in receipt of Exhibits 56, 58, 301A, 301B, or 304.

## LEGAL STANDARD

The Parties have both moved for judgment pursuant to Federal Rule of Civil Procedure 52, which provides that:

> In an action tried on the facts without a jury . . . , the court must find the facts specially and state its conclusions of law separately. The findings and conclusions may be stated on the record . . . or may appear in an opinion or a memorandum of decision filed by the court. Judgment must be entered under Rule 58.

Fed. R. Civ. P. 51(a)(1). Unlike a Rule 56 motion for summary judgment, in a Rule 52 motion the court does not determine "whether there is an issue of material fact, but instead whether [the claimant] is disabled within the terms of the policy." *See Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1095 (9th Cir. 1999). In so doing, the Court is to "evaluate the persuasiveness of conflicting testimony and decide which is more likely true" and make specific findings of fact. *Id.*

## CONCLUSIONS OF LAW

Two causes of action remain from Plaintiff's original Complaint: his second cause of action for failure to provide plan/policy documents in violation of 29 U.S.C. § 1132(c)(1)(B) against Defendant A-BC, and his fourth cause of action for LTD plan

benefits under 29 U.S.C. § 1132(a)(1)(B) against Defendant MetLife.  *See generally* ECF Nos. 1, 56, 58.

## I.     Second Cause of Action: Failure to Provide Plan/Policy Documents

Plaintiff contends that "Defendant Anheuser-Busch Companies LLC., as Plan administrator failed, once again, to provide documents requested by Plaintiff."  ECF No. 58 at 2.  Pursuant to Section 1132(a)(1)(A) of Title 29 of the United States Code, "[a] civil action may be brought . . . by a participant or beneficiary . . . for the relief provided for in subsection (c) of this section."  Subsection (c) provides:

> Any administrator . . . who fails or refuses to comply with a request for any information which such administrator is required by this subchapter to furnish to a participant or beneficiary (unless such failure or refusal results from matters reasonably beyond the control of the administrator) by mailing the material requested to the last known address of the requesting participant or beneficiary within 30 days after such request may in the court's discretion be personally liable to such participant or beneficiary in the amount of up to $100[5] a day from the date of such failure or refusal, and the court may in its discretion order such other relief as it deems proper.

29 U.S.C. § 1132(c)(1)(B).

The Court denied Plaintiff's prior request for statutory penalties, *see* ECF No. 56 at 35, and, as far as the Court can tell, Plaintiff fails to address this cause of action in either version of his Motion, *see generally* ECF Nos. 114, 118.  In any event, Defendants are correct that "the statute authorizing penalties applies only to plan administrators and is limited to requests by participants and beneficiaries for 'the latest updated summary plan description, and the latest annual report, and terminal report, the bargaining agreement, trust agreement, contract, or other instruments under which the plan is established or operated."  Defs.' Mot. at 21 (quoting 29 U.S.C. § 1024(b)(4)).  Not only did Plaintiff

---

[5] In 1997, the statutory penalty was increased from $100 a day to $110 dollars a day.  29 C.F.R. § 2575.502c-1.

"receive[] copies of the pertinent Plan documents through the prior litigation," *id.*, but "Defendants timely provided [Plaintiff] with a copy of the entire Administrative Record relating to his claims," *id.* (citing ECF No. 61-2).  The Court therefore **GRANTS** Defendants' Motion and **DENIES** Plaintiff's Motion to the extent Plaintiff seeks statutory penalties under Section 1132(c)(1)(B).  *See, e.g.*, *Shaw v. Life Ins. Co. of N. Am.*, 144 F. Supp. 3d 1114, 1139–40 (C.D. Cal. 2015) (denying request for penalties under Section 1132(c)(1) where the plaintiff had sought penalties against a party other than the plan administrator for failing to provide a copy of the administrative record).

## II.     Fourth Cause of Action: Denial of LTD Benefits

Plaintiff's primary contention is that "MetLife failed to conduct a full and fair review [of its denial of his claim for LTD benefits], as ordered by this Court on May 02, 2016." ECF No. 58 at 1.  Under Section 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), a beneficiary or plan participant may sue in federal court "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B); *see also CIGNA Corp. v. Amara*, 563 U.S. 421, 425 (2011).

### A.     *Standard of Review*

"A denial of benefits challenged under 29 U.S.C. 1132(a)(1)(B) 'is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Polnicky v. Liberty Life Assurance Co. of Boston*, No. C. 13-1478 SI, 2013 WL 6071997, at *2 (N.D. Cal. Nov. 18, 2013) (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)).  "Where the plan or policy grants such discretion, the standard of review is abuse of discretion." *Cerone v. Reliance Standard Life Ins. Co.*, 13CV184 MMA (DHB), slip op. at 3 (S.D. Cal. Mar. 28, 2014) (citing *Saffon v. Wells Fargo & Co. Long Term Disability Plan*, 522 F.3d 863, 866 (9th Cir. 2008)).

Here, Defendant assumes that standard of review is *de novo*.  Defs.' Mot. at 15. Although the Policy unambiguously provides discretionary authority for MetLife to

determine eligibility for benefits, *see* PLAN at 56,[6] the Court takes this as a tacit admission that California Insurance Code § 10110.6 applies to the Plan and is not preempted by ERISA. Accordingly, *de novo* review is appropriate.

Under the *de novo* standard, "[t]he court simply proceeds to evaluate whether the plan administrator correctly or incorrectly denied benefits, without reference to" procedural irregularities. *See Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 963 (9th Cir. 2006). "[W]hen the court reviews a plan administrator's decision under the de novo standard of review, the burden of proof is placed on the claimant" to prove that she is disabled by a preponderance of the evidence. *Muniz v. Amec Const. Mgmt., Inc.*, 623 F.3d 1290, 1294 (9th Cir. 2010) (collecting cases).

## B.    Analysis[7]

The Plan provides that a claimant is disabled where, "due to Sickness . . . [the claimant is] receiving Appropriate Care and Treatment determined by [the claimant's] Physician as necessary to treat the Sickness or injury," the claimant is "complying with the requirements of such treatment," and the claimant is "unable to earn . . . more than 80% of [the claimant's] Predisability Earnings or adjusted Predisability Earnings at [the claimant's] Regular Occupation from any employer in [the claimant's] Local Economy." PLAN at 23. Plaintiff's date of disability is August 10, 2014. *See* AR 3692. To be eligible for benefits, Plaintiff must demonstrate that he was continuously disabled throughout the 180-day elimination period, *see* PLAN at 23, *i.e.*, through February 6, 2015.

/ / /

---

[6] "In carrying out their respective responsibilities under the Plan, the Plan Administrator and other Plan fiduciaries (which shall include MetLife as the Claim Fiduciary) shall have discretionary authority to interpret the terms of the Plan and to determine eligibility for and entitlement to Plan benefits in accordance with the terms of the Plan. Any interpretation or determination made pursuant to such discretionary authority shall be given full force and effect, unless it can be shown that the interpretation or determination was arbitrary and capricious."

[7] Although Plaintiff raises several procedural irregularities, *see generally* Pl.'s Mot., these are not relevant to the Court's *de novo* review, which focuses solely on the adequacy of Plaintiff's evidence to support his disability. *See, e.g.*, *Shaw*, 144 F. Supp. 3d at 1137–39.

Plaintiff claims disability based on the following conditions: "di[zziness], nausea, ringing in ear, ear pressure, fatigue, high [blood pressure], palp[i]tations, [irritable bowel syndrome], difficulty recalling names [and] facts, math difficult[y]."  AR 3252.  Among other things, the voluminous Administrative Record contains Plaintiff's medical records; statements from Plaintiff, Plaintiff's family, and Plaintiff's treating physicians; and reports from MetLife's independent medical consultants addressing these various symptoms.

### 1.   Legal Principles Guiding the Court's Review

"ERISA does not contain a body of contract law to govern the interpretation and enforcement of employee benefit plans. . . .  Rather, Congress intended that courts apply contract principles derived from state law but by guided by the policies expressed in ERISA and other federal labor laws."  *Richardson v. Pension Plan of Bethlehem Steel Corp.*, 112 F.3d 982, 985 (9th Cir. 1997).  The Court therefore "interpret[s] terms in ERISA insurance policies 'in an ordinary and popular sense as would a [person] of average intelligence and experience.'"  *Evans v. Safeco Life Ins. Co.*, 916 F.2d 1437, 1441 (9th Cir. 1990) (quoting *Allstate Ins. Co. v. Ellison*, 757 F.2d 1042, 1044 (9th Cir. 1985)) (second alteration in original).

"That a person has a true medical diagnosis does not be itself establish disability." *Jordan v. Northrop Grumman Corp. Welfare Benefit Plan*, 370 F.3d 869, 880 (9th Cir. 2004), *overruled on other grounds by Abatie*, 458 F.3d at 969.  Rather, the claimant must prove that her impairment is disabling.  *See Matthew v. Shalala*, 10 F.3d 678, 680 (9th Cir. 1993) ("The mere existence of an impairment is insufficient proof of disability. . . .  'A claimant bears the burden of proving that an impairment is disabling.'") (citation omitted).

"[I]t is unreasonable to reject 'a claimant's self-reported evidence where the plan administrator has no basis for believing it is unreliable, and where the ERISA plan does not limit proof to 'objective' evidence.'"  *Shaw*, 144 F. Supp. 3d at 1128 (collecting cases). "Similarly, [courts] have held it unreasonable to reject Plaintiff's treating/examining physician's notes of Plaintiff's self-reporting and subjective observations, or other assertedly 'subjective' evidence, where, as here, . . . the applicable Plan does not restrict

the type of evidence that may be used to demonstrate disability." *Id.* (alterations in original). "At the same time, the prospect of receiving disability benefits based on an ailment whose extent is objectively unverifiable provides a strong incentive to falsify or exaggerate . . . [;] assessment of the claimant's credibility thus becomes exceptionally important' in such cases." *Id.* (quoting *Fair v. Bowen*, 885 F.2d 597, 602 (9th Cir. 1989)) (alterations in original).

"[T]he weight assigned to a physician's opinion will vary according to various factors, including '(1) the extent of the patient's treatment history, (2) the doctor's specialization or lack thereof, and (3) how much detail the doctor provides supporting his or her conclusions.'" *Biggar v. Prudential Ins. Co. of Am.*, 274 F. Supp. 3d 954, 968 (N.D. Cal. 2017) (quoting *Shaw*, 144 F. Supp. 3d at 1129). "[T]he more detail a physician provides concerning the bases for his or her diagnosis and opinion, the more weight his or her conclusions are afforded." *Id.* (quoting *Shaw*, 144 F. Supp. 3d at 1130–31). Moreover,

> the assumption that the opinions of a treating physician warrant greater credit than the opinions of plan consultants may make scant sense when, for example, the relationship between the claimant and the treating physician has been of short duration, or when a specialist engaged by the plan has expertise the treating physician lacks.

*Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 832 (2003).

Narratives provided by the claimant and her family and friends are properly accorded less weight than medical evidence in the record given their potential for bias and inability to "diagnose . . . medical condition[s] or assess . . . functional capacity in the way individuals trained in the medical field can." *Shaw*, 144 F. Supp. 3d at 1136, 1139. Accordingly, "[r]eports from individuals with no medical background cannot overcome medical evidence." *Id.* at 1136.

Although governed by different standards, *see Montour v. Hartford Life & Acc. Ins. Co.*, 588 F.3d 623, 635–36 (9th Cir. 2009), "SSA rulings are highly relevant to an ERISA disability determination." *Bilyeu v. Morgan Stanley Long Term Disability Plan*, 711 Fed.

App'x 380, 383 (9th Cir. 2017) (citing *Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 679 (9th Cir. 2011); *Montour v. Hartford Life & Acc. Ins. Co.*, 588 F.3d 623, 635–36 (9th Cir. 2009)); *see also Shaw*, 144 F. Supp. 3d at 1135 ("While the standard used by the SSA to assess disability differ from those set forth in the policy, the fact that benefits were denied can be said to lend some minimal support to [the claim administrator]'s ultimate resolution of the claim."); *Toth v. Auto. Club of Cal. Long Term Disability Plan*, No. CV014653MMMRCx, 2005 WL 1877150, at *31 (C.D. Cal. Jan. 27, 2005) (finding that SSA's denial of disability supported disability plan administrator's decision to terminate benefits).

### 2.    Review of Plaintiff's Conditions

#### a.    Dizziness

One of the conditions Plaintiff contends is disabling is his "di[zziness]," AR 3252, which Plaintiff describes as "the equivalent of having five beers and then standing up fast," AR 2657.  According to Plaintiff, his dizziness is "always there and [he] fall[s] often."  AR 2659.  Plaintiff explains that, "[i]n 2014 [he] had an intensive physical therapy treatment for [his] balancing issues and that was a lifesaver" because he "ha[s] learned to train [him]self to move slowly and deliberately to avoid running into walls and objects," like his dog.  AR 2660.

The Court concludes that, although Plaintiff's dizziness is well documented in his medical records, he has failed to establish that it is disabling.  On August 20, 2014, Plaintiff followed up with an audiologist for dizziness, where he received a "vestibular/balance test."  *See* AR 317–324.  The results were "not consistent with superior canal dehiscence."  AR at 317.  On September 3, 2014, Plaintiff "report[ed] ongoing dizziness and nausea" with "no change since his last visit" to his primary care provider, Dr. Rogers, who also noted that Plaintiff's "disability was improved."  AR 332.  On September 11, 2014, Plaintiff presented to urgent care with palpitations.  *See* AR 361–386.  Although Plaintiff reported "dizziness," AR 362, the examination notes indicated that he was "[n]egative for dizziness, tingling, tremors and headaches" and that his "[g]ait [was] normal."  AR 364.

Plaintiff visited his gastroenterologist, Dr. Go, on October 13, 2014, who again noted that Plaintiff was "[n]egative for dizziness."  AR 390.  When Plaintiff visited Dr. Rogers on October 22, 2014, he reported "persistent dizziness."  AR 406.  On January 8, 2015, Dr. Rogers reported that, "[s]ince [Plaintiff's] last visit, his symptoms have not improved at all.  In fact, they have been fairly constant for almost 2 years."  AR 415.  Nonetheless, Plaintiff's primary care provider told one of MetLife's independent consulting physicians that Plaintiff "does not use a cane or walker and has not falls."  AR 866.

Taken as a whole,[8] the records from Plaintiff's treating physicians indicate that Plaintiff reported his symptoms inconsistently, at best, and that his treating physicians never documented any objective manifestations of his reported dizziness, such as unsteadiness or an abnormal gait.  The one exception—occurring before the alleged disability onset date—is Plaintiff's physical therapist, who noted extreme dizziness and that Plaintiff swayed and could not walk in a straight line, *see* AR 141, although Plaintiff's neurologist reported later that same day that Plaintiff had a normal gait with no shuffling.  *See* AR 189.  Further, Plaintiff's physical therapist noted significant improvement over the course of his therapy and determined, based on testing, that Plaintiff was not at risk for falling.  *See* AR 219–223.

/ / /

---

[8] Although the relevant period is between August 10, 2014 and February 6, 2015, prior records are consistent.  On January 15, 2014, Plaintiff consulted with Dr. Gharibshahi, a neurologist, who performed a neurological evaluation indicating that Plaintiff was "able to stand with eyes closed without excessive swing or loss of balance" and that his "[g]ait was normal with no shuffling" and "[n]o antero/retro pulsion noted."  AR 76.  Plaintiff followed up with Dr. Trent on February 6, 2014, who indicated that he "had [Plaintiff d]o balance testing and . . . [h]is test results are normal" and referred Plaintiff to physical therapy.  AR 113.  Plaintiff started physical therapy on March 14, 2014, *see* AR 138–147, where Plaintiff reported a "[d]izziness rating" of 10/10, AR 140, and the therapist noted that Plaintiff's gait was "unstead[y and [Plaintiff was] unable to walk in straight line" and that Plaintiff had "increased sway, loss of balance without hands for support on wall."  AR 141.  That same afternoon, however, Plaintiff returned to Dr. Gharibshahi, who reported that "[g]ait was normal with no shuffling," AR 152, and when Plaintiff visited his gastroenterologist, Dr. Go, on April 14, 2014, Plaintiff reported no dizziness.  AR 189.  When Plaintiff returned to physical therapy for his fourth session on May 5, 2014, the therapist noted "good progress with balance," AR 223, and dynamic gait index testing revealed that Plaintiff was not a fall risk.  AR 219–223.  Nonetheless, Plaintiff informed the therapist that he was "considering permanent disability."  AR 218.

Dr. Trent, Plaintiff's ENT, wrote a letter in support of Plaintiff's application for disability benefits, writing that Plaintiff

> has been willing to try any interventions that we could think of such as physical therapy and medications, but all has been unsuccessful.  In fact, he did try to work in the beginning with his disease, but he was unsafe at work, so had to go on disability. . . . There is no sign of improvement over the years I have known him.

AR 12.  Similarly, Dr. Rogers wrote that he "fully support[s] [Plaintiff's] application for disability, since in all likelihood, he will be unable to return to work for the long term in his current state."  AR 13.  Dr. Rogers added that, "[e]ver since I have met him [in 2014,] he has suffered from debilitating dizziness . . . that has made it impossible to work," and that "[t]he symptoms have been going on for almost 3 years and do not show any signs of improvement despite thorough evaluation (including multiple specialist evaluations) and trials of various treatments as indicated in the medical records."  *Id.*  The assertion that Plaintiff had shown no improvement with his dizziness, however, is not supported by the medical records, which showed improvement following physical therapy.  *See* AR 219–223.

MetLife's independent consulting neurologist, on the other hand, concluded that Plaintiff's dizziness did not render him disabled.  *See* AR 868.  Specifically, the independent medical consultant determined, based on a review of Plaintiff's medical records, that,

> [d]espite the complaint of dizziness, the claimant has always had a normal gait on exam and normal tandem gait when tested. Physical therapy evaluation demonstrated that dizziness improved with treatment and the claimant was not at risk for falls.  Despite complaining that he had falls, the claimant was never seen walking with an assistive device such as a cane or a walker.  There is no evidence that dizziness impairs the claimant's function.

///

*Id.*  The SSA similarly concluded that Plaintiff's dizziness did not render him incapable of performing his duties as a warehouse manager.  *See* AR 2705, 3336.

On this record, the Court concludes that Plaintiff has failed to demonstrate that it is more likely than not that he was unable to perform the material duties of a warehouse and facility manager.  *See* AR 1820, 3540–3548; *see also Biggar*, 274 F. Supp. 3d at 966–69 (concluding that the claimant, who claimed disabling tremors, loss of balance, and sleepiness from his Parkinson's Disease, had "failed to demonstrate that he suffered from physical impairments so substantial that they prevented him from" working where his treating physician's "conclusions about the severity of [his] symptoms are not supported by her own contemporaneous general examinations of [his] physical condition").

### b.   Gastrointestinal Problems

Plaintiff also suffers from nausea and irritable bowel syndrome ("IBS").  *See* AR 3252.

### i.   IBS

According to Plaintiff, his "IBS has caused infrequent bouts of constipation and diarrhea."  AR 2658.  Dr. Tran diagnosed Plaintiff with constipation type IBS in April 2014, *see* AR 176, noting that it was the "likely cause" of his reported nausea, *see* AR 211; *see also* AR 177, and referred him to a gastroenterologist, *see* AR 177.  On October 13, 2014, Plaintiff saw Dr. Go, the gastroenterologist, who reported that Plaintiff "[s]till ha[d] nausea" but "that his IBS symptoms including constipation improved after stopping meds - lactulose, ondansetron, meclizine."  AR 389; *see* AR 406.  Dr. Rogers confirmed that Plaintiff's IBS had improved at a visit on October 22, 2014.  *See* AR 792.  There is scant additional evidence of IBS in Plaintiff's medical records.

Neither Dr. Trent nor Dr. Rogers addresses Plaintiff's IBS in their letters to MetLife, *see* AR 12–13, and Dr. Maraian did not offer an opinion specific to Plaintiff's IBS, *see* AR 868–69.  Based on the evidence of improvement in Plaintiff's medical records and the absence of any evidence that Plaintiff's IBS (and attendant constipation and diarrhea) would limit his ability to perform the material duties of his occupation, the Court concludes

that Plaintiff has failed to meet his burden of demonstrating that his IBS was disabling. *See, e.g.*, *Perez v. Lincoln Nat'l Life Ins. Co.*, No. 2:18-CV-07422-CAS (JCx), 2019 WL 4673216, at *9–10 (C.D. Cal. Sept. 25, 2019) (concluding that the claimant had failed to establish disability where treating gastroenterologists did not opine that IBS had rendered the claimant totally disabled and one "assessment suggest[ed] an improvement" in the claimant's gastroenterological condition).

ii. Nausea

Plaintiff also claims that he is "nauseated all the time," AR 2659, and, "[a]t least weekly the combination of pills and food give [Plaintiff] a fo[u]l stomach as if [he] was poisoned" and he "ha[s] to remain still and wait hours for this to subside," AR 2658. "Coughing and gag[g]ing . . . is regular (at least hourly) but not constant but can lead to throwing up (normally 3-5 times a week)." AR 2659. Plaintiff "feel[s] as if [he] continuously ha[s] a lump in [his] throat and a sour stomach." *Id.* "Strong smells will immediately make [him] gag or throw up," and he "can't wear a belt anymore because that adds pressure to [his] stomach and bending over is a real chore." *Id.*

On August 6, 2014, shortly before his disability onset, Plaintiff followed up with Dr. Rogers. *See* AR 302–312. The nausea reportedly began in May 2013, along with many of Plaintiff's other symptoms. AR 304. Dr. Rogers noted that Plaintiff had "missed a lot of work over the last year due to dizziness and nausea," *id.*, although it is unclear how often, and that he "[w]ould agree to 3 months disability since patient is having difficulty functioning at work," AR 306. Dr. Rogers stopped Plaintiff's anti-nausea medication, *see* AR 310, and recommended that he follow up in one month, *see id.* At his September 3, 2014 follow up, Dr. Rogers reported both "no change since his last visit" and that Plaintiff's "disability was improved." AR 332. When Plaintiff presented to urgent care on September 11, 2014, the exam notes indicated that he was "[n]egative . . . for nausea and vomiting" and "[n]egative for dizziness." AR 364. On October 13, 2014, Plaintiff followed up with Dr. Go, who noted that Plaintiff "[s]till has nausea," AR 389, and recommended "[a]nti-reflux measures and low FODMAP diet," AR 398, and

"[p]robiotics" and "[r]egular exercise," AR 399.   On January 8, 2015, Plaintiff saw Dr. Rogers, where he complained of "chronic nausea" with "[v]omiting 3-4 times a week" that had not improved since his last visit or over the past two years.   AR 415.

Both Dr. Trent and Dr. Rogers noted Plaintiff's nausea in their letters in support of Plaintiff's disability application, *see* AR 12–13, without further elaboration.   Dr. Maraian noted that Plaintiff "complained of chronic nausea unchanged with antiemetics" but that "[t]here is no documentation that the claimant had any impairment from nausea such as poor intake of solids or liquids" or "unintended weight loss or treatment for dehydration." AR 868.   The Court is sympathetic to Plaintiff's nausea and other ailments, but Plaintiff has failed to show that nausea causing him to vomit several times a week prevented him from performing the material duties of his position.   Consequently, the Court concludes that Plaintiff has failed to carry his burden of demonstrating that his nausea was disabling. *See, e.g.*, *Watson v. Metro. Life Ins. Co.*, No. CV-11-01393-PHX-GMS, 2012 WL 5464986, at *17 (D. Ariz. Nov. 8, 2012) ("[T]he [claimant]'s GI problem, while uncomfortable, is not sufficiently serious as to require additional limitations on [the claimant]'s ability to work.")

c.   Ear Problems

Plaintiff claims disability related to "ringing in ear" and "ear pressure."   AR 3252. In his personal statement to MetLife, Plaintiff indicated that "[t]he ear pressure is similar to having an ear ache or needing to pop your ears due to pressure on a plane, but more intense and painful."   AR 2657.   He claimed that "[t]his condition is always present and has wide swings."   AR 2659.   According to Plaintiff, "[t]he left ear has about 60% and the right 40% of this pressure."   *Id.*   As for the ringing, it "is about 90% of the time and ranges from low (like listening in a large seashell) to moderate (an intolerable loud nose) to extremely loud (as if a gun was shot next to your ear)," with the extremely loud happening "around quarterly."   *Id.*   The ringing in Plaintiff's ears also disrupts his sleep, "keep[ing] him] awake at least once or twice a week or sometimes . . . for 3-4 consecutive days, usually around 1-2 AM."   *Id.*   Although not mentioned in his disability claim, Plaintiff also claims

hearing loss that "is greater in left ear and can range from constant to sometimes deafening." *Id.*

A review of Plaintiff's medical records during the elimination period reveals that, on August 20, 3014, Plaintiff saw an audiologist for Vestibular Evoked Myogenic Potentials ("VEMP") testing. *See* AR 317–324. He complained of "periodic tinnitus every 3 months, which begins in his right ear and then changes to his left ear and last about a week." AR 317. He noted that "[t]he left ear tinnitus is severe and occurs about every 3 months" and reported "constant fullness in both ears." *Id.* The audiologist concluded that "VEMP results are not consistent with superior canal dehiscence." *Id.* Plaintiff mentioned "fullness in the ears" at his September 3, 2014 appointment with his general practitioner, *see* AR 333, and his intention to follow up with his ENT. *See* AR 332. On September 5, 2014, Plaintiff's ENT noted that Plaintiff's "audiogram showed an asymmetric hearing loss on the right ear," AR 340, and decided to "order an MRI scan of the internal auditory canal to see if acoustic neuroma is present," *id.* On September 8, 2014, Plaintiff saw an allergist/immunologist for "PLUGGED EAR ringing and pressure," AR 348, adding that "for the past 15 months, []he has been having plugged ear like he is on an airplane," AR 349. The allergist noted that Plaintiff's "Symptoms [were] possibly due to eustachian tube dysfunction." AR 352. On October 22, 2014, Plaintiff saw his primary care provider for "RINGING IN EARS left ear." *See* AR 403. Dr. Rogers noted that the ringing in Plaintiff's left ear had been going on "intensely" for seven days and "usually occurs once every few months." AR 405. He also reported that Plaintiff's "[r]ecent MRI was unremarkable" and that Plaintiff had sent his records to Best Doctors, where "Meniere's was their leading [diagnosis] but symptoms have be[en] constant not intermittent and has not responded to diuretics." AR 406. Dr. Rogers continued that, "per ENT it seems like there is no clear diagnosis to explain his [symptom]s and no further workup planned." AR 407. Dr. Trent noted in his letter to MetLife that Plaintiff "ha[d] undergone CT scans, MRI scans[,] VNG tests[,] VEMP tests[,] balance tests, sleep tests," AR 12, while Dr. Rogers noted that Plaintiff suffers from "debilitating . . . tinnitus," AR 13.

15-CV-1162 JLS (LL)

The symptoms Plaintiff reported to his treating physicians of tinnitus every few months differ greatly from those reported to MetLife in his personal statement, where he claimed that the tinnitus was present 90 per cent of the time.  The Court concludes that Plaintiff's reports to his physicians are more reliable than those made to MetLife following the initial denial of his disability claim.  Further, testing revealed no abnormalities beyond mild hearing loss in one ear.  *See* AR 275–276 (July 2014 hearing test[9]); AR 317 (August 2014 VEMP); AR 340, 342 (September 2014 MRI); AR 2604 (March 2015 MRI); AR 2272–2282 (October 2015 VNG).  Given the intermittent nature of Plaintiff's tinnitus as reported to his physicians and the fact that Plaintiff's physicians found no evidence of a substantial inner ear impairment, the Court concludes that Plaintiff has failed to carry his burden of proving that his tinnitus or the fullness in his ears rendered him disabled for purposes of the Plan.  *See, e.g.*, *Hodjati v. Aetna Life Ins. Co.*, No. CV 13-05021 SVW, 2014 WL 7466977, at *14 (C.D. Cal. Dec. 29, 2014) (concluding that the claimant had failed to establish disability where "[n]ine office visits . . . led to no definitive neurological diagnosis" and "time and time again, [the treating physician] noted that [the claimant]'s neurological exam was within normal limits," meaning the claimant's "own treating physician—the doctor most exposed to and familiar with the claimant—did not find evidence of significant neurological impairment") (citing *Salomaa*, 642 F.3d at 676).

### d.   Fatigue

Plaintiff also claims that he suffers from disabling fatigue, *see* AR 3252, which feels like his "illness [i]s 'sucking the life out of [him],'" AR 2660.  He says that he can no longer "take [his] dog out for regular walks anymore because [he] can't seem to make it around the block."  *Id.*  He also believes that his fatigue has left him susceptible to other illnesses, such as bronchitis.  *See id.*

---

[9] Specifically, the hearing test revealed "moderate loss 2k-4 KHz rising to mild loss at 6 KHz and within normal limits at 0 KHz" for Plaintiff's right ear, *see* AR 275, and "mild senaorineural hearing loss to low normal hearing 2k-6 KHz" for Plaintiff's left ear, *see* AR 276.  Plaintiff reported to the audiologist, however, that "[h]e ha[d] had hearing test[s] at work that he has not 'passed' for the last 4-5 years," AR 275, indicating that the hearing loss did not interfere with his ability to perform his material job duties.

15-CV-1162 JLS (LL)

Although Plaintiff's complaints of fatigue are well documented in the medical records, the first mention of chronic fatigue syndrome in Plaintiff's medical records appears to be from Plaintiff's September 11, 2014 urgent care visit, where it is noted as part of his health history, *see* AR 363 ("Brian Driscoll is a 57 year old man with history of chronic fatigue syndrome . . . ."), and added to his "Active Problem List," *see* AR 365. Accordingly, there is no indication in Plaintiff's medical records that any of his treating physicians ever diagnosed him with chronic fatigue syndrome.

To the contrary, Plaintiff consulted with Dr. Gharibshahi on January 15, 2014, who "discussed . . . fatigue and circadian rhythm disorder" and indicated that "[c]ircadian rhythm disorder and Obstructive Sleep Apnea (OSA) can definitely lead to daytime fatigue."[10]  *See* AR 77.  Dr. Gharibshahi therefore referred Plaintiff to the sleep clinic.  *See id.*  An actigraph from March 4, 2014 revealed "considerable variation in bedtime and . . . early evening naps as well," which "could be consistent with poor sleep hygiene."  AR 150.  At a follow-up appointment with Dr. Gharibshahi on March 14, 2014, Plaintiff confirmed that he did not have a "consistent sleep cycle."  *Id.*  Dr. Gharibshahi diagnosed Plaintiff with a circadian rhythm disorder and indicated that "[c]ircadian rhythm disorder and Obstructive Sleep Apnea (OSA) can definitely lead to daytime fatigue."  AR 151.  On July 9, 2014, Plaintiff attended an "[a]ll night attended [polysomnography] sleep study with CPAP titration performed" and was prescribed a CPAP machine.  AR 271.  The sleep study revealed "Mild/Moderate obstructive sleep apnea/hypopnea syndrome" and that "PAP appeared effective in treating sleep disordered breathing."  AR 281.  When Plaintiff followed up with Dr. Manthena in July 25, 2014, Dr. Manthena "discussed extensively . . . side effects associated with sleep apnea such as excessive daytime sleepiness" and how,

/ / /

---

[10] Plaintiff was diagnosed with OSA between 2004 and 2009, *see* AR 462, 641, but was not using his prescribed constant positive airway pressure ("CPAP") machine, *see* AR 462, because he "[f]elt like PAP did not improve symptoms previously and actually made things worse (has a cough/congestion which he believes PAP aggravates)," *see* AR 281.

"due to variability with [Plaintiff's] PAP [treatment it was] unclear how much his OSA is adding to symptoms of fatigue."  AR 282.

On this record, the Court concludes that Plaintiff has not established that it is more likely than not that he suffers from chronic fatigue that would render him unable to perform the material duties of his regular occupation.  Plaintiff was diagnosed with poor sleep hygiene, circadian rhythm disorder, and OSA, which Plaintiff's treating physicians indicated could be responsible for his fatigue.  Although he was prescribed CPAP therapy, which a sleep study indicated was effective in treating his OSA, Plaintiff declined to use the machine because he believed it made his symptoms worse and contributed to congestion and a cough.  Given that treatment with CPAP may have successfully treated Plaintiff's OSA and mitigated his fatigue, Plaintiff's "failure to comply with recommended treatment plans . . . weigh[s] in assessing [his] credibility," *see Shaw*, 144 F. Supp. 3d at 1133, which is "exceptionally important" given the subjective nature of Plaintiff's complaints of fatigue, *see id.* at 1128.  Plaintiff's credibility is further eroded by the fact that his diagnosis of chronic fatigue syndrome appears to have been self-reported.  Finally, the SSA concluded that Plaintiff's fatigue and sleep apnea were not disabling.  *See* AR 2706, 3337.  On de novo review, the Court concludes, in light of the foregoing, that Plaintiff has failed to demonstrate that his fatigue was disabling.

e.   Cardiovascular Issues

Plaintiff contends that his high blood pressure and heart palpitations are disabling, *see* AR 3252, and wrote to MetLife that he was "most concerned about bouts of high blood pressure and/or rapid pulse that seem to happen 4/5 times a week," AR 2661.  According to Plaintiff's medical records, however, his palpitations generally occurred at night, *see* AR 304, and a Holter monitor "was unremarkable," *id.*  The palpitations were not accompanied by shortness of breath or chest pain.  *See id.*  Testing has generally been normal and recorded the palpitations as normal sinus rhythm.  *See* AR 313.  The one exception was Plaintiff's September 11, 2014 visit to urgent care, where he reported palpitations and an elevated heart rate one day after starting to wean himself off of a blood pressure medication,

*see* AR 363, although Plaintiff stabilized after receiving his blood pressure medication, *see* AR 368.  There does not appear to have been a recurrence, and neither Dr. Trent nor Dr. Rogers mentioned Plaintiff's palpitations in their letters in support of Plaintiff's disability application.  *See* AR 12–13.  Accordingly, Plaintiff has failed to demonstrate that his palpitations prevent him from performing the material functions of his occupation.

As for Plaintiff's blood pressure, in June 2014, Dr. Tran noted both that it was "controlled with meds," *see* AR 246, and "uncontrolled" on account of Plaintiff requiring three medications whereas he had previously required only one, *see* AR 248.  In September 2014, Plaintiff presented with hypertension to the urgent care after weaning himself off one of his blood pressure medications, *see* AR 363; however, by October 2014, Dr. Rogers indicated that Plaintiff's hypertension was "well controlled on current medications," *see* AR 407.  Again, neither Dr. Rogers nor Dr. Trent invokes Plaintiff's hypertension as a reason for his disability.  *See* AR 12–13.  The medical record therefore reveals that Plaintiff's hypertension is controlled with medication and does not render him disabled. *See, e.g.*, *Lawrence v. Life Ins. Co. of N. Am.*, 144 F. Supp. 3d 1140, 1145 (C.D. Cal. 2015) ("The evidence in the administrative record shows that [the claimant]'s hypertension is generally well-controlled and even when it is not, . . . there is no evidence that it interferes with his job function or creates an undue risk of a life-threatening event while on the job.").

### f.   Cognitive Difficulties

Finally, Plaintiff has ADHD, which is well controlled with Ritalin.  *See* AR 15.  In his claim to MetLife, Plaintiff contended that he had "difficulty recalling names [and] facts, math difficult[y]."  AR 3252.  Plaintiff explained to MetLife that "[i]t seems [his] brain has turned to mush and [he] often appear[s]/[is] absentminded."  AR 2660.  He claims to struggle with words, AR 2660–2661, and says he "can't even do simple math," AR 2661.

On September 3, 2014, Dr. Rogers noted that Plaintiff had "some difficulty with concentration," AR 332, and that his "[r]elatively minor lapses in concentration[] may have been from interrupted sleep, continue to monitor," AR 333–334.  Previously, in January 2014, Plaintiff saw neurologist Dr. Gharibshahi for, among other things, his "[f]oggy

brain," *see* AR 459; nonetheless, Dr. Gharibshahi noted that Plaintiff "[r]ecent & remote memory is intact for details of medical history," AR 461. Plaintiff's cognitive difficulties were not mentioned at his October 22, 2014 or January 8, 2015 appointments with Dr. Rogers, *see* AR 403–422, and no doctor commented in exam notes that Plaintiff appeared to struggle to find words.

Dr. Trent noted "memory lapses" in his letter to MetLife, *see* AR 12, while Dr. Rogers mentioned Plaintiff's "difficulty concentrating," *see* AR 13. Dr. Maraian, however, opined that "[t]here is no evidence of any cognitive deficits." AR 868. Specifically, Dr. Maraian noted that "[c]ognitive screen by the various providers documented in the records was normal" and that "[n]o formal neuropsychological testing was performed." *Id.* Dr. Maraian added that "[t]he included records show that the claimant had enough cognitive abilities to start a lawsuit against several parties without the representation of an attorney." *Id.* Dr. Vora similarly concludes that "[t]he cognitive functional limitations of impaired memory, decreasing the orientation, alertness/higher cortical functions are not supported," because "[n]one of these notes . . . support the cognitive functional limitations." *See* AR 880. The SSA also concluded that, "[t]hough you may have memory issues and a history of ADHD, your records show that you are able to think, communicate and act in your own interest," and "[t]he evidence shows you are able to adjust to ordinary emotional stresses, and to get along with others, as well as to do your usual activities and to remember and follow basic instructions." *See* AR 2706, 3337.

Given the scarce evidence of cognitive impairment, which Plaintiff's own physician considered "minor," the Court concludes that Plaintiff has failed to demonstrate by a preponderance of the evidence that his cognitive impairments were disabling. *See, e.g.*, *Biggar*, 274 F. Supp. 3d at 969–70 (concluding that the claimant had failed to show by a preponderance of the evidence that cognitive impairments caused by Parkinson's, including short-term memory issues and difficulty focusing, were disabling given that self-reported symptoms were contradicted by non-psychiatric physician's inconsistent notes); *Shaw*, 144 F. Supp. 3d at 1139 (concluding that the claimant had failed to prove disabling

memory loss and lack of focus and concentration where self-reported symptoms were contradicted by testing showing cognition within normal limits).

> 3.  *Conclusion*

Following de novo review of the Administrative Record, including Plaintiff's medical records and the reports prepared by his treating physicians, Best Doctors, and MetLife's independent medical consultants, the Court agrees with MetLife's decision that Plaintiff has failed to establish by a preponderance of the evidence that his conditions— either individually or in the aggregate—continuously prevented him from performing the material duties of a warehouse and facility manager between August 10, 2014, and February 6, 2015.  The Court therefore concludes that MetLife properly denied Plaintiff's application for long-term disability benefits pursuant to the Plan.

**CONCLUSION**

In light of the foregoing, the Court **GRANTS** Defendants' Motion (ECF No. 107) and **DENIES** Plaintiff's Motion (ECF No. 118).  The Clerk of Court **SHALL ENTER** Judgment in favor of Defendants and **CLOSE** the file.

**IT IS SO ORDERED.**

Dated:  November 6, 2020

*Janis L. Sammartino*
Hon. Janis L. Sammartino
United States District Judge

15-CV-1162 JLS (LL)